**RUE v. FEUZ CONST CO., Inc. et al.**
Civ. A. 2825–50.

United States District Court
District of Columbia.

Feb. 25, 1952.

Ralph R. Sachs, Washington, D. C., for plaintiff.

Colladay & Colladay, J. Richard Earle, all of Washington, D. C., for garnishee.

KEECH, District Judge.

This case is before the court on objections to proposed findings of fact, conclusions of law, and judgment, and on a motion by the garnishee to reopen the case for further testimony on its behalf.

The background of the case is, briefly: The plaintiff Rue, who holds a judgment in the sum of $4,500 against the defendant, Feuz Construction Company, issued an attachment of funds to the credit of the defendant Feuz in the hands of the garnishee, Second National Bank of Washington. The Bank answered that it could not determine in what amount it was indebted to Feuz "because of terms of contract, performance of which is incomplete, and because of pendency of U.S. tax levy for $2,669.93, plus interest from 9–19–49 and of assignment by Feuz Construction Co. in favor of Waller Paving Co. in the sum of approximately $9,000, original amount." The case came on for hearing on the traverse by the plaintiff to the garnishee's answer.

The facts brought out by the record made at the trial were: On June 27, 1949, the Feuz Construction Company entered into a subcontract with Walter B. Avery for excavating, filling topsoil, grading, seeding, and sodding, to be done in accordance with the plans and specifications incorporated in the prime contract of Walter B. Avery with the Board of Education of Montgomery County, Maryland, for construction of five schools and landscaping of the adjacent grounds. On August 14, 1949, Walter B. Avery died, and the work under the prime contract was completed by the Second National Bank of Washington, executor of the will of Walter B. Avery and garnishee in this action. The subcontract of Feuz provided certain time limits on the various portions of its work, and that the contractor should have the right, at any time, to delay or suspend the commencement or execution of the whole or any part of the work, with an extension of the time for completing the whole work equal to the period of such delay or suspension. The subcontract further provided Feuz should do the work in a thoroughly workmanlike manner to the satisfaction of the contractor and owner and in strict conformity with the prime contract, as supplemented by the plans and specifications.

Feuz proceeded with the work under the subcontract without default, in accordance with the plans and specifications and in a workmanlike manner until December 7, 1949, at which time a substantial part of the subcontract had been performed and Feuz was ordered by the Bank to cease work until further notice, in view of the fact that it was essential that certain phases of the construction be completed before Feuz might finish the final items of its subcontract. The work was suspended until March 3, 1950, when the Bank ordered Feuz to resume work. Feuz prepared to go forward with the work, but thereafter, at the Bank's request, agreed to permit the Bank to complete the relatively small amount of work remaining under its subcontract. It was orally agreed that $7,000 would be the maximum amount necessary to complete the job, but this stipulation was not included in a written memorandum signed by the parties on April 12, 1950, which on its face is only a partial memorandum of the agreement of the parties. In completing the subcontract the Bank charged against the Feuz account the sum of $17,991.55, representing expenses allegedly incurred in completing the landscaping after April 12, showing a balance due Feuz of only $414.60. The expenditure of this excessive sum was not necessitated by any failure of Feuz to perform its work under the subcontract in accordance with the plans and specifications or in a thoroughly workmanlike manner. On the contrary, in completing the job the Bank plowed under and reseeded many of the areas seeded by Feuz, changed some grades, and put in sod in excess of the contract requirements.

The plaintiff failed to prove that a figure less than $7,000, the agreed maximum, would have completed the unfinished por-

tion of the subcontract in conformity with the plans and specifications.

The original contract price under the subcontract was $42,500 and agreed extras prior to April 12, 1950, $5,982.56. Prior to April 12, Feuz received credits totalling $30,076.41. Prior to April 12, two items in the amounts of $550 and $104.65 were admittedly charged by error against the Feuz account.

There was no contest of the United States tax levy of $2,669.93, plus interest from September 19, 1949, and there is filed in this case a settlement of the assignment of the Waller Paving Company for the sum of $1,000 to be paid out of any amount found due the Feuz Company from the Second National Bank under its subcontract.

The trial of this case extended over a period from January 23 to 28, inclusive, taking up the equivalent of three entire court days. Ample opportunity was afforded both parties for the presentation of all pertinent evidence and protracted argument of counsel. At the conclusion of the argument, the matter was treated by the court as submitted. After consideration thereof, on February 1 proposed findings of fact and conclusions of law, finding the sum of $12,060.80 due under the Feuz subcontract and held by the garnishee, were prepared by the court and submitted to respective counsel.

Counsel for the garnishor submitted a proposed order in conformity with the court's findings. On February 12, 1952, counsel for the garnishee met with the court and counsel for the garnishor, and interposed objections to certain findings of fact and to the conclusions of law. The garnishee's objections are in substance an objection to the judgment of the court. Counsel also orally moved the court to reopen the case for the purpose of receiving additional testimony, the general purport of which was embraced within three affidavits presented to the court. Counsel for the garnishor objected to the motion to reopen the trial.

The effect of the affidavits was to refute the court's finding on the testimony of record that at the time the garnishee bank took over the Feuz subcontract it was agreed that the maximum amount which would be chargeable to the account of the Feuz Company for work done in completion of the subcontract should be $7,000. This motion was subsequently reduced to written form and filed February 13, 1952, incorporating the affidavits by reference. It was agreed that the garnishor's objections to a reopening of the case applied to the written motion.

Counsel for the garnishee at the time of presenting the affidavits urged that reopening of the case is within the discretion of the court.

The garnishee in his written motion asks that the court reopen the proceedings for the purpose of receiving further evidence on behalf of the garnishee upon certain "critical issues," and as grounds therefor states:

"1. The tentative decision of the Court that a contract and agreement was made on April 12, 1950, whereby the Executor undertook to complete the performance of the Feus contract and further bound itself not to charge any more than $7,000.00 in that connection, has come as a surprise to the Garnishee and its counsel.

"2. The evidence as heretofore adduced is insufficient to sustain a finding that such a substitutional contract was made.

"3. The essence of the final judgment to be rendered should be plain justice and honesty; and the Court has not had the benefit of sufficient disclosure of the facts and circumstances incident to the meeting on April 12, 1950, at which the supposed agreement and contract was made.

"4. The Garnishee hereby proffers additional evidence to place the Court in a better position to make a correct decision, such evidence being indicated by the affidavits of John A. Reilly, A. Hamilton Wilson and Paul Baker, which have been submitted to the Court; and said affidavits are hereby referred to and made part hereof.

"5. It is within the sound discretion and power of the Court to reopen the case upon a substantial showing that an unjust and incorrect judgment is about to be entered. The affidavits above referred to

make such a showing, and the discretion of the Court should be exercised in favor of this motion.

"6. There has been no final judgment entered in this cause; but a final judgment is proposed which, according to the affidavits heretofore submitted to the Court, would perpetuate dishonesty and untruthfulness and would place a premium of some $4,918.50 upon the same. Although, as stated, no final judgment has been entered, the posture of the case at this time is analogous to what it would be later if such a judgment should be entered. Rule 60(b) of the Federal Rules of Civil Procedure, as amended [28 U.S.C.A.] (effective March 19, 1948) contemplates that relief should be granted (after final judgment) under the circumstances now presented, such circumstances being within the purview of subdivisions (1) and (3), and the general provision that the rule does not limit the power of the Court to set aside a judgment for fraud upon the Court."

As to grounds 1, 2, 3, and 4: All the issues upon which the proposed findings were made by the court were raised by testimony and argument at the trial of this case. Further, counsel misstates the findings. As to the argument that the court should have the benefit of sufficient disclosure of the facts and circumstances incident to the meeting on April 12, 1950, full opportunity was afforded the garnishee to present whatever evidence it desired at the trial when the issues were raised.

As to ground 5: The principal contention of counsel for the garnishee is that the reopening of this case is within the discretion of the trial court, that such discretion should be exercised upon a substantial showing that an unjust and incorrect judgment is about to be entered, and that the three affidavits make such a showing.

There is nothing to indicate that any of the parties whose testimony the garnishee now seeks to present to the court were at the time of the trial in any wise incapable of appearing or beyond the reach of the garnishee. Indeed, the parties from whom additional evidence would be elicited are persons who are and have been readily available to the garnishee.

There is no contention—as there cannot be—that the additional evidence is newly discovered.

The garnishee's motion coming at this time and on the state of this record is, in effect, a motion for a new trial on the ground that an attorney who tries his case largely on one theory, without producing evidence then available to meet the other issues raised at the trial, should be permitted, after the court renders judgment against him, to reopen the case in order to put in his defense to those issues which at the trial he deemed unworthy of refutation.

The court concedes that under Rule 59(a) the court has discretion to reopen a case on a motion for new trial for the taking of additional testimony. However, such discretion should be exercised only where the circumstances show justification for departure from the usual procedure. It is the view of this court that failure of a party to call available witnesses to meet issues raised at the trial, does not constitute justification for reopening a case after determination by the court. Public policy and the court calendar are such as not to permit a party litigant to gamble on reliance on one theory at the trial and, after a contrary view of the evidence is adopted by the court and is to be followed in its judgment on the facts of record, to seek to reopen the case to meet the other issues raised by that record, in an attempt to make for a finding in its favor on the theory adopted by the court.

As to counsel's argument that the court should exercise its discretion to reopen the case upon a substantial showing that an incorrect and unjust judgment is about to be entered, the affidavits now offered by the garnishee do not make a substantial showing that a different judgment would be rendered if the case were reopened for presentation of the facts contained in them.

In substance, the facts now stated in the garnishee's affidavits in contradiction of the court's proposed findings are:

That the figure of $7,000 for completing the Feuz subcontract was never mentioned at the meeting at the bank on April 12,

1952, and that there was no agreement as to any maximum figure to be spent by the Bank in completing the subcontract, but, on the contrary, it was agreed that the Bank should obtain material and services as economically as possible.

That the work as carried out and completed by the Bank was done efficiently and as economically as it could be under the conditions then existing and not in excess of the requirements of the contract.

That the Feuz Company asked the Bank to complete the work under its subcontract because it was not in a position to complete such work.

That the Feuz Company never objected or called attention to the fact that any grades were so steep that erosion would occur and seeding thereon would produce an unsatisfactory result.

That the contours provided in the plans and specifications under the contract were not unsuitable for seeding and sodding, and that the work under the Feuz subcontract was completed by the Bank in accordance therewith.

That the general superintendent of construction, the affiant Baker, never saw a representative of the Feuz Company on the job after April 12, 1950, although Feuz was asked to keep a representative on the job to protect its interests or to have one there as often as it chose.

In determining what was the oral agreement of the parties at the time the Bank took over completion of the Feuz subcontract the court may look to all the preliminary negotiations leading up to the agreement, which indicate that even if a maximum figure of $7,000 was not specifically agreed on at the bank on April 12, 1950, there was a prior agreement that the cost of completing the subcontract would not exceed that amount.

Assuming that there was no agreement as to the maximum to be spent by the Bank in completing the subcontract, the law would imply an agreement that the Bank should spend only a reasonable amount for completion of the work. The only evidence as to what such reasonable amount would be are the estimates of $4,000 to $5,000 by Mr. Feuz, the evidence as to the amount of work to be completed, and the testimony that in the negotiations preliminary to the Bank's taking over completion of the job representatives of the Bank estimated that $7,000 would take care of all contingencies. The witness Feuz did not show exactly how he arrived at his estimate, and admitted that the Bank did not agree with it. That the $7,000 estimate was sufficiently high is contradicted only by the Bank's claim that it actually spent approximately $18,000 after April 12, 1950, to complete the landscaping to the school board's satisfaction, and by bare statements that such expenditure was necessary.

On the other hand, the record shows that some regrading and extra sodding were done after April 12, for which Feuz was not given credit as an extra in the recapitulation of the Bank, and that a substantially complete reseeding job was done by the Bank, although the only expert testimony as to the condition of the seeded areas was to the effect that the stand of grass was normal for the season, for the amounts and kinds of seed and fertilizer called for by the specifications, and for the contours of the areas seeded, and that all that was required was hand-raking and reseeding of the bare spots. That this is all that was required is borne out by the letter of the architect, Ronald S. Senseman, addressed to the Bank on April 17, 1950. The Bank's one witness, Mr. Hoffman, testified only that "men with more experience" than he told him that it would be much cheaper to do the reseeding with an automatic seeder. No evidence was introduced by the Bank as to the condition of the grounds when it took over or to support Mr. Hoffman's testimony as to the necessity of doing the job in the manner it was done by the Bank.

While the expenditures after April 12, 1950, stated in the Bank's recapitulation may be broken down into various categories (which appear excessive on their face), it is impossible to tell how much of each category was actually spent on completing the obligations of Feuz under its subcontract and how much was unnecessarily expended

by the Bank in an effort to please the school board and secure prompt acceptance and settlement of the prime contract. Therefore, the only figure which may be resorted to as the amount reasonably necessary for the Bank's completion of the Feuz subcontract is the estimate of $7,000 made at the time of the preliminary negotiations by Mr. Klein, estimator and office manager for Walter B. Avery, who remained on the job for the Bank after Mr. Avery's death. This estimate was testified to by the garnishor's witnesses and was not denied by the garnishee's witness or in the affidavits filed by the garnishee.

■ Under this view of the evidence, even though the court should not determine that $7,000 was an agreed maximum, it would be warranted in using the $7,000 figure as the reasonable cost of completing the obligations of Feuz under its subcontract, in which event the money judgment reached would be the same as that in the proposed findings, conclusions, and judgment.

As to the statements that the Feuz Company asked the Bank to complete the work under its subcontract because it was not in a position to do so, there is no assertion that the Bank took over the work under Article XXII of the subcontract or complied with the terms of that provision, under which completion of the subcontract by the contractor would have been at the subcontractor's risk. The garnishee admits that a voluntary agreement was reached by the parties; and the preponderance of the evidence is that the Bank representatives wished to complete the unfinished landscaping and that the subcontractor reluctantly agreed thereto.

As to the statements that the Feuz Company never objected or called attention to the fact that any grades were so steep that seeding would produce an unsatisfactory result, the garnishee does not now offer contradiction by the one person named to whose attention it was testified the Feuz Company called the matter.

The statements in the affidavits that the work was completed by the Bank in accordance with the plans and specifications un-der the contract and not in excess thereof, are contradicted by the testimony of the Bank's witness Hoffman that certain extras were incurred after the Bank took over the work.

The statement of the affiant Baker that he never saw any representative of the Feuz Company on the job after April 12, 1950, is of little weight, in view of the fact that he was superintendent of the construction on five different sites and considering the testimony of Mr. Chicarell, a disinterested witness, that he walked the jobs with Mr. Herbert Feuz, Mr. Edward Feuz, and Mr. Sachs, their attorney, on April 26 and 27, 1950, when he made his report on the condition of the seeded areas. Further, the Feuz Company admitted that after it complained, without any effect, as to the manner in which the Bank contemplated completion of the landscaping and the fact that employees on the payroll charged against the Feuz account were doing other work for the contractor, it made no further attempt to oversee the landscaping or to check the payroll.

Ground 6 of the garnishee's motion alleges that the final judgment proposed "would perpetuate dishonesty and untruthfulness and would place a premium of some $4,918.50 upon the same," and that the circumstances presented by the case entitle the garnishee to relief similar to that under the provisions of Rule 60(b), clauses (1) and (3). Under these provisions the court may relieve a party from a final judgment for mistake, inadvertence, surprise, or excusable neglect, or for fraud, misrepresentation, or other misconduct of an adverse party.

■■ As to mistake, inadvertence, surprise, or excusable neglect, none has been shown by the garnishee, and it is difficult to conceive how counsel can contend there has been any, since the theory of the garnishor's case was made clear on the first day of the trial. As to fraud, misrepresentation, or other misconduct of an adverse party, the garnishee's memorandum in opposition to the court's proposed findings characterizes the testimony on which they were based as "loose talk." While the witnesses in question may have testi-

fied with some inaccuracy as to details, the majority of witnesses do. In the court's judgment, the garnishor's witnesses were on the whole credible. Mere contradiction of their understanding of the oral agreement or recollection of the facts should not subject these witnesses to charges of dishonesty, fraud, and misconduct.

For the foregoing reasons, the court holds that there is not such a substantial showing as to warrant the court in reopening the trial for further testimony on behalf of the garnishee.

The garnishee's motion to reopen is therefore denied, and the court has signed the findings of fact, conclusions of law, and judgment.