**GRUMMAN AIRCRAFT ENGINEER-ING CORPORATION**

v.

**The RENEGOTIATION BOARD,**
**Appellant**

**No. 71–1730.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1973.

Decided July 3, 1973.

Rehearing Denied Sept. 27, 1973.

Irwin Goldbloom, Atty., Dept. of Justice, with whom L. Patrick Gray, III, Asst. Atty. Gen. at the time the brief was filed, Harold H. Titus, Jr., U. S. Atty., and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellant.

Tom M. Schaumberg and Rexford T. Brown, Washington, D. C., for appellee.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and VAN PELT,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge.

This appeal involves the validity of a District Court order requiring the Renegotiation Board to disclose documents explaining decisions of the Board and its decision-making delegates, the Regional Boards, made between 1962 and 1965, as to whether 14 companies [1] accrued excess profits in their business with the Government. These documents were sought by Grumman Aircraft Engineering Corporation under the Freedom of Information Act, 5 U.S.C. § 552 (1970), which mandates that Government agencies, including the Renegotiation Board, make available for public inspection and copying "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases * * *." 5 U.S.C. § 552(a)(2)(A). The Act also requires disclosure of "identifiable records," 5 U.S.C. § 552(a)(3), but exempts from the disclosure requirement certain specified materials, 5 U.S.C. § 552(b)(1)–(9).

This is the second time this case is before us. Initially the District Court refused to order disclosure on the ground that the requested documents contained trade secrets and other confidential information covered by the Act's exemption for "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4). On appeal we held that Congress did not intend to exempt

---

* Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. The 14 firms are: Avco Corp.; Bell Aerospace Corp.; The Boeing Co.; Douglas Aircraft Co.; Fairchild Hiller Corp.; General Dynamics Corp.; Ling-Temco-Vought, Inc.; Litton Industries, Inc.; Lockheed Aircraft Corp.; Martin Marietta Corp.; McDonnell Co.; North American Aviation, Inc.; Northrop Corp.; and Republic Aviation Corp.

an entire document simply because it contained confidential information, that the proper procedure where exempted data is contained in the requested documents is to accommodate the Freedom of Information Act's dual policy of promoting public awareness and administrative fairness, on the one hand, and the need for justifiable secrecy on the other, by striking identifying details from the documents prior to release. We remanded the case to the District Court for further proceedings to determine precisely which of the documents or parts thereof sought by Grumman should be produced under the Act. Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S.App.D.C. 147, 425 F.2d 578 (1970).

On remand the Board agreed to produce many of the documents requested, but disagreement remained as to whether certain documents generated by the Board and its statutorily authorized decision-making delegates, the Regional Boards, in the decision-making process were "final opinions, including concurring and dissenting opinions,"·producible under 5 U.S.C. § 552(a)(2)(A) or, as appellant contends, inter- or intra-agency memoranda exempt from production under 5 U.S.C. § 552(b)(5). The District Court's opinion, D.D.C., 325 F.Supp. 1146 (1971), describes at length the kinds of documents at issue and holds that the documents requested by Grumman should be produced under the Freedom of Information Act as "final opinions, including concurring and dissenting opinions," of the Renegotiation Board. Given the evident care of the District Court's delineation of the facts and its discussion of the issues, we avoid covering the same ground. We hold its findings of fact not clearly erroneous and concur in its conclusions and its judgment. Indeed, we find its judgment as to the principal documents still in dispute supportable on two additional grounds.[2]

I

The District Court ordered disclosure of Regional Board reports in Class A renegotiation cases[3] where pursuant to Renegotiation Board regulations (a) the Regional Board decides that a clearance, or finding of no excess profits liability, is proper[4]; (b) the Renegotiation Board (hereinafter the National Board) notifies the Regional Board that "it is in accord with the [Regional Board's] determination"[5]; and (c) the Regional Board issues a notice to the contractor under investigation of his non-liability.[6] These reports, which the District Court found were "prepared and signed by a Regional Board member, and [were] signed on behalf of the Regional Board by its Chairman," 325 F.Supp. at 1153, were held by the District Court to be a "final opinion of the [National] Board," *ibid.*, and thus required to be produced under the Freedom of Information Act.

The National Board strongly challenges this disposition on the ground that the Regional Boards are merely advisory to the National Board, that the National Board is in fact the final decision-maker in cases of this sort, and, finally, that the unrecorded and undisclosed reasons for the National Board's agreement with the

2. We agree, of course, with the ruling and reasoning of the District Court requiring disclosure of reports and recommendations of divisions of the Renegotiation Board and any concurrences or dissents thereto. 325 F.Supp. at 1152–1153.

3. Cases are designated as Class A generally when a firm has derived from the Government contract under scrutiny more than $800,000 in profits. 32 C.F.R. § 1471.2(b) (1972). Where the contract has yielded less than $800,000 in profits, it is designated Class B. *Ibid.* The documents sought here all involved Class A cases.

4. *See* 32 C.F.R. §§ 1472.3(i), 1473.2(a) (1972). Once the Regional Board has made its determination, it notifies the contractor thereof and forwards the case, along with the report at issue here, to the National Board. *Ibid.*

5. 32 C.F.R. § 1473.2(a).

6. *Ibid.* The form of notice issued in such cases is printed at 32 C.F.R. § 1498.6(a) (1972).

Regional Board's finding might have been different from those contained in the Regional Board report. As the District Court's opinion indicated, this argument loses much of its force when one considers the perfunctory nature of the National Board's review in such cases, the fact that in cases of this sort the National Board, in accepting the determination of the Regional Board, rejects the alternative of assigning the case to its own docket for independent consideration by a division of its membership,[7] and the fact that the determination reflected in the clearance notice to the contractor is attributed to "the Regional Board pursuant to due delegation of authority" under National Board regulations.[8]

Conceding, *arguendo*, that the Regional Board report is not tantamount to a "final opinion" of the National Board, we have no doubt that it does represent the "final opinion" of the Regional Board. Not only is the report, as the District Court found, "prepared and signed by a Regional Board member, and * * * signed on behalf of the Regional Board by its Chairman," 325 F.Supp. at 1153, but the practicalities of National Board procedure dictate this conclusion. When the Regional Board decides that a clearance should be granted in the type of case at issue here, the report is the only document in the file it forwards to the National Board which purports to justify the Regional Board's clearance recommendation in terms of the statutory standards the National Board is required to apply to the facts of the case.[9] And the National Board itself acknowledges that the report is treated at the National Board level as the Regional Board's justification of its recommendation.[10] Given this function, plus the formal role it is assigned in the National Board's regulations, 32 C.F.R. § 1473.-2(a), and the District Court's findings, the Regional Board report clearly occupies the same opinion status as any document produced by a decision-maker in an adjudicatory-like process and forwarded to a reviewing tribunal.

For purposes of the Freedom of Information Act, the crucial question then becomes whether the Regional Board, wholly apart from the National Board, is to be considered an "agency"

7. The procedure followed in the kinds of cases producing the documents Grumman seeks here is in sharp contrast to the case where the National Board is not satisfied with the Regional Board's determination. In the latter case the National Board will notify the Regional Board "that it has not satisfied itself that the determination is correct," 32 C.F.R. § 1473.2(a), will "direct the Regional Board to advise the contractor that a different determination may be made," *ibid.*, and in many cases will "reassign the case to the Board." *Ibid.* When this reassignment occurs, the case will generally be "assigned to a [3-man] division of the [5-man National] Board. The division will study the information and data assembled by the Regional Board and will determine what additional information or data, if any, is needed. The division will secure such additional information and data as it deems necessary and will conduct an independent study of the case. The division will not be bound or limited in any manner by any evaluation, recommendation or determination of the Regional Board." 32 C.F.R. § 1472.4(b). The deposition

given by the chairman of the National Board indicates that this sort of intensive, wholly *de novo*, review is not undertaken where the National Board does not reassign the case to its own docket but merely notifies the Regional Board that it agrees with its determination and orders the Regional Board to issue notice. Appendix at 26–27, 172–173.

8. 32 C.F.R. § 1498.6(a).

9. The statutory standards are set forth in the Renegotiation Board's governing statute, 50 U.S.C.App. § 1213(e)(1)–(6) (1970). This court has termed the standards "rather general" and has noted that along with the Board's regulations, *see* 32 C.F.R. § 1460.8 (1972), they vest the Board with "extremely broad discretion" in making a determination of excess profits. Bannercraft Clothing Co. v. Renegotiation Board, 151 U.S.App.D.C. 174, 178 n. 3, 466 F.2d 345, 349 n. 3 (1972), cert. granted, 410 U.S. 907, 93 S.Ct. 967, 35 L.Ed.2d 269 (1973).

10. Brief for appellant at 13.

to which the provisions of the Act, including the requirement of disclosure of "final opinions," applies. *Compare* Soucie v. David, 145 U.S.App.D.C. 144, 149–153, 448 F.2d 1067, 1072–1076 (1971), with International Paper Co. v. FPC, 2 Cir., 438 F.2d 1349, 1359, cert. denied, 404 U.S. 827, 92 S.Ct. 61, 30 L. Ed.2d 56 (1971). We believe the Regional Board should be so considered.

The statutory definition of "agency" in the Freedom of Information Act is supplied in Section 2 of the Administrative Procedure Act, 5 U.S.C. § 551(1) (1970),[11] which states: " 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency \* \* \*." This statutory language obviously disposes of any contention that the Regional Board cannot be considered an "agency" merely because it is subject, in the kinds of cases for which the reports are sought here, to *de novo* review by the National Board. But beyond that the provision is hardly self-defining, as both this court[12] and commentators,[13] have acknowledged.

We believe that several broad guidelines as to the meaning of the term "agency" have emerged and that they

compel the conclusion that the Regional Boards fit within the APA definition. The leading case, of course, is Soucie v. David, *supra,* where we held that the Office of Science and Technology in the Office of the President is to be considered an "agency" for the purposes of Section 2 of the Administrative Procedure Act and therefore for the Freedom of Information Act. *Soucie,* relying on the legislative history of the APA, reasoned that the "APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." 145 U.S.App.D.C. at 150, 448 F.2d at 1073. We then concluded that OST met this broad standard and was not to be considered merely personal staff to the President.[14] We relied on several factors for this conclusion, including indications that Congress, in acquiescing in the presidential reorganization plan that created OST, believed that the unit would assume the independent administrative function of evaluating congressionally approved federal scientific programs. 145 U.S.App.D.C. at 151–152, 448 F.2d at 1074–1075.

The factors we relied on in *Soucie* to conclude that OST was an "agency" for

11. Soucie v. David, 145 U.S.App.D.C. 144, 149–150, 448 F.2d 1067, 1072–1073 (1971).

12. Soucie v. David, *supra* note 11, 145 U.S.App.D.C. at 150, 448 F.2d at 1073.

13. *See* Freedman, Administrative Procedure and the Control of Foreign Direct Investment, 119 U.Pa.L.Rev. 1, 4–18 (1970). Professor Davis has characterized the definition of "agency" supplied in the statute as "not very satisfactory." 1 K. Davis, Administrative Law Treatise § 1.01 at 1 n. 1 (1958). But the definition he suggests—"a governmental authority, other than a court and other than a legislative body, which affects the rights of private parties through either adjudication or rule-making," *id.* at 1—is probably itself too narrow, as we suggested in Soucie v. David, *supra* note 11, 145 U.S. App.D.C. at 150, 448 F.2d at 1073. The Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act, drafted in 1967 just after the Freedom of Informa-

tion Act was enacted, discusses the Act's applicability to any "agency" as defined in 5 U.S.C. § 551(1), and suggests a broader definition: "every department, board, commission, division, or other organizational unit in the executive branch." *Id.* at 4. It is clear that the Regional Boards, as part of the Renegotiation Board apparatus, are "in the executive branch," 50 U.S.C.App. § 1217(a) (1970), and they are certainly organizational units. If the Renegotiation Act itself and the regulations mean anything, *see* text at pp. 714–715 *infra,* they would appear to meet the definition supplied by the Attorney General's memorandum.

14. *Compare* International Paper Co. v. FPC, 2 Cir., 438 F.2d 1349, 1359 (1971) (holding that the staff of the FPC is not to be considered an agency for purposes of either the Freedom of Information Act or the APA on the ground that it lacks any legally recognized decision-making status). *See also* Miller v. Smith, S.D.N.Y., 292 F.Supp. 55 (1968).

purposes of the Administrative Procedure Act and thus for purposes of the Freedom of Information Act are clearly evident in this case. There is no question that the Regional Boards have been granted what *Soucie* termed "substantial independent authority." Equally, the Regional Boards fit the functional definition of "agency" proposed by the commentator who has given the question the most exhaustive study, Professor James O. Freedman.[15] He argues that the primary task in applying the term "agency" is "to identify centers of gravity of the exercise of administrative power * * where substantial 'powers to act' with respect to individuals are vested." [16] The National Board regulations, setting forth the powers of the Regional Boards, point unmistakably to an affirmative conclusion in this respect as well. The Regional Boards have their own investigating and negotiating personnel with whom the contractors are instructed to discuss their excess profit liability prior to decision of their cases by the Regional Boards.[17]

Following these investigations and negotiations, moreover, the members of the Regional Board are instructed to make a formal recommendation as to the contractor's excess profit liability [18] and this recommendation is communicated openly to the contractor prior to any assumption of jurisdiction by the National Board.[19] Furthermore, in many cases the Regional Boards are empowered to make final decisions not even reviewable by the National Board.[20] In other words, the Regional Boards serve as a discrete, decision-producing layer in the renegotiation process.[21] And this is the case from the standpoint of the National Board, which often, but not always, reviews their decisions,[22] as well as from the standpoint of the regulated parties, the contractors, who conduct negotiations with the Regional Boards and are communicated the Regional Board's conclusions prior to and separate from any possible subsequent negotiations or decisions at the National Board level.

It is also clear to us that the exercise of formal decision-making power by the Regional Boards, as authorized by delegation from the National Board, was within Congress' contemplation when it established the Renegotiation Board apparatus. Evidence that Congress believed the governmental body in question would exercise authority of the kind customarily granted legislatively was an

---

15. *See* note 13 *supra*.

16. Freedman, *supra* note 13, 119 U.Pa. L.Rev. at 9.

17. *See* 32 C.F.R. § 1472.3.

18. 32 C.F.R. § 1472.3(i).

19. *Ibid.;* 32 C.F.R. § 1473.2(a).

20. The Regional Boards are given this power in Class B cases, *see* note 3 *supra*, where it decides that a clearance should be granted, 32 C.F.R. § 1473.2(b), and where it has reached an agreement with the contractor that a given amount of excess profits should be refunded, 32 C.F.R. § 1474.3(b). Review by the National Board is mandatory in Class A cases whether the Regional Board decides a clearance should be granted, 32 C.F.R. § 1473.2(a), reaches an agreement with the contractor on a specified refund, 32 C.F.R. § 1474.3(a), or decides that a refund order should be issued and is unable to reach agreement with the contractor on a specified amount, 32 C.F.R. § 1475.3 (a) (1972). In Class B cases, where no agreement can be reached between the contractor and the Regional Board and the Regional Board determines that a refund of excess profits should be paid, the "[National] Board may review such determination upon its own motion, or, in its discretion, at the request of the contractor." 32 C.F.R. § 1475.3(b).

21. *See also* Bannercraft Clothing Co. v. Renegotiation Board, *supra* note 9, 151 U.S.App.D.C. at 179, 466 F.2d at 350, where we characterized the Regional Board decisions as follows: "[T]he recommendations made by the lower bureaucratic levels * * * are * * * exceedingly important to the contractor. Indeed, their importance derives from their non-finality, since it is the possibility that they will be reversed and increased which provides the incentive to accept them without resort to theoretically available *de novo* appeals."

22. *See* note 20 *supra*.

important factor in *Soucie,* as we have pointed out, and we believe it exists in ample measure here. In fact, we need go no further than the Renegotiation Act of 1951 itself for a conclusive indication that Congress foresaw and approved creation of Regional Boards with the kind of decisional authority we feel is sufficient to hold that the Regional Boards are "agencies." Section 107(d) of the statute, 50 U.S.C.App. § 1217(d) (1970), provides in pertinent part:

> "The Board may delegate in whole or in part any function, power, or duty (other than its power to promulgate regulations and rules and other than its power to grant permissive exemption * * *) *to any agency of the Government, including any such agency established by the Board,* and may authorize the successive redelegation, within limits specified by it, of any such function, power, or duty to any agency of the Government, including such agency established by the Board. * * * "

(Emphasis added.)

There is further reason to believe that Congress meant the term "agency" in the above quoted statute—describing the subsidiary decision-making bodies now known as Regional Boards—to have the same meaning as the term has in Section 2 of the APA. For Congress, in establishing the Renegotiation Board, had the detailed requirements of the APA at the forefront of its concern. In another section of the Renegotiation Act of 1951, 50 U.S.C.App. § 1221 (1970), it specifically excluded the Board's functions from the operation of the APA with one important exception, the APA's public information provision, which is now, of course, the Freedom of Information Act. Given this legislative attention to the APA, the choice of the word "agency" must have been purposeful, lending further support to our view that the Regional Boards are covered by the term "agency" utilized in the APA and thus

must be considered "agencies" for purposes of the Freedom of Information Act.

The National Board's own regulations corroborate the conclusion that the Regional Boards, apart from the National Board, are agencies subject to the Freedom of Information Act. And the National Board's own view of its responsibilities, as evidenced in its regulations, is entitled to considerable weight in interpreting the relevant statutes. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S. Ct. 792, 13 L.Ed.2d 616 (1965). The regulations acknowledge that pursuant to the Freedom of Information Act all clearances and agreements determining excess profits must be disclosed. 32 C. F.R. § 1480.5 (1972). In many cases these decisions to issue clearances or make agreements with contractors are solely the Regional Board's decisions and no review whatever is undertaken by the National Board.[23] Thus the regulations clearly subject to the requirements of the Freedom of Information Act documents that represent administrative actions whether taken by the National Board or exclusively by the Regional Boards. This suggests to us that the National Board itself, for some purposes at least, considers the Regional Boards "agencies" separately subject to the Freedom of Information Act's provisions.

Since we conclude that the Regional Board reports at issue here should be considered "final opinions" of an "agency" and thus subject to disclosure under 5 U.S.C. § 552(a)(2)(A), it necessarily follows that the documents cannot be exempted from disclosure as "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" under Exemption 5 of the Act, 5 U.S.C. § 552(b)(5). Obviously, the two sections are mutually exclusive. By definition "final opinions, including concurring and dissenting opinions" cannot be "inter-agency or intra-agency memorandums."

---

**23.** *See* 32 C.F.R. §§ 1473.2(b), 1474.3(b) and the discussion in note 20 *supra.*

■ Exemption 5 is simply irrelevant to final agency opinions because such opinions are decisional documents rather than purely pre-decisional, consultative and deliberative inter- or intra-agency memoranda. *See* Section II *infra.* The fact that determinations by the Regional Boards are in some cases reviewable by the National Board does not make the Regional Board reports on which they are based inter- or intra-agency documents under Exemption 5 and thus not disclosable final opinions of the Regional Boards, any more than lower court opinions subject to appeal are not final. Indeed, finality is ordinarily the touchstone of appealability. *See, e. g.,* 5 U.S.C. § 704 (1970); 28 U.S.C. § 1291 (1970). Moreover, the Administrative Procedure Act specifically provides that an "agency" may be reviewable by another agency, 5 U.S.C. § 551(1) (1970), and the Freedom of Information Act requires disclosure of final orders and opinions of "each agency," 5 U.S.C. § 552(a)(2)(A), whether or not reviewable by another agency.

## II

■ We also believe the District Court's decision can stand for reasons other than the status of Regional Board reports as "final opinions, including concurring and dissenting opinions." The Freedom of Information Act mandates disclosure of a far broader category of agency papers. 5 U.S.C. § 552(a)(3) calls for production of "identifiable records." There is no question that the Regional Board reports fit into this category, as Grumman pointed out in its original pleadings.[24] No argument has been made by the Renegotiation Board that the papers were not "identifiable" or that Grumman's request was insufficiently specific. The nature of the documents and the naming of the companies and subject matter concerned and the dates when they were prepared make clear that the Government could identify them without inordinate difficulty. *See* National Cable Television Assn v. FCC, 156 U.S.App.D.C. 91, 479 F.2d 183 (1973); Irons v. Schuyler, 151 U.S.App. D.C. 23, 465 F.2d 608, *cert. denied,* 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972). And it is settled that once the "identifiability" requirement is met, as it is here, the central question remaining in Freedom of Information Act litigation is whether any of the Act's exemptions apply. *See* Bristol Myers Co. v. FTC, 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970).

As we have indicated, appellants rely on Exemption 5. In our view this exemption for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" does not apply to the documents at issue, wholly apart from their status as "final opinions." We reach this conclusion on the ground that the policies underlying the exemption are simply not jeopardized by disclosure of the documents Grumman seeks here.

■ At the outset we must acknowledge that "[d]rawing such a line between what may be withheld and what must be disclosed is not without difficulties." EPA v. Mink, 410 U.S. 73, 86 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973). At the same time it seems clear that Congress, in enacting the exemption, did not mean for agencies to refuse disclosure of documents merely on the ground that such documents were customarily circulated only within the bureaucracy. *See* Bristol Myers Co. v. FTC, *supra,* 138 U.S.App.D.C. at 26, 424 F.2d at 939. If agency custom were the touchstone for applicability of the exemption, the pro-disclosure policy of the Act would be easily evaded. As its language indicates, the exemption is intended to adopt an evidentiary privilege that preceded the Freedom of Information Act. The statutory modification of the phrase "inter-agency or intra-agency memorandums or letters" with the phrase "which would

---

24. Joint Appendix at 41 in Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S.App.D.C. 147, 425 F. 2d 578 (1970).

not be available by law to a party other than an agency in litigation with the agency" makes clear the Act's adoption of a pre-existent privilege from discovery, and this court has so held. Ackerly v. Ley, 137 U.S.App.D.C. 133, 138, 420 F.2d 1336, 1341 (1969).[25] *See also* EPA v. Mink, *supra,* 410 U.S. at 87–90, 93 S.Ct. 827; Tennessean Newspapers, Inc. v. FHA, 6 Cir., 464 F.2d 657, 660 (1972); GSA v. Benson, 9 Cir., 415 F.2d 878, 880 (1969). And this privilege, it is also clear, aims to further a discrete set of policies. *See* Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 944–947, 141 Ct.Cl. 38 (1958); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, D. D.C., 40 F.R.D. 318, 324–327 (1966), affirmed per curiam, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

The case law involving the privilege for governmental papers which underlies Exemption 5 indicates that the purpose of nondisclosure is protection of the "consultative functions" of government. EPA v. Mink, *supra,* 410 U.S. at 87–90, 93 S.Ct. 827. The privilege aims to cover "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, *supra,* 40 F.R.D. at 324. Put another way, the privilege aims to protect "free discussion of prospective operations and policy." Kaiser Aluminum & Chemical Corp. v. United States, *supra,* 157 F. Supp. at 947. Protecting the confidentiality of advice given during governmental deliberations prior to actual promulgation of policy is, of course, eminently sensible. For it is well recognized that pre-decisional deliberation requires privacy so that staffers and decision-makers alike may engage in free and frank consideration of alternatives.[26] Moreover, as this court suggested recently in Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 245–247, 450 F.2d 698, 706–708 (1971), the public might be misled by exposure to discussions occurring before policy affecting it were actually determined. And finally, delving into predecisional policy deliberations impairs the integrity of decision-makers; officials should be judged by what they decide, not for the matters they properly considered before making up their minds.[27]

But the case for applying the privilege, and thus the exemption, is markedly weaker where the documents at stake are not solely part of the consultative and deliberative process, but rather reflect actual decisions communicated outside the agency. Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, *supra,* for example, stressed that the documents sought in that case were "pre-decision data." [28] Professor Davis has put the matter well, arguing that the exemption

---

**25.** *See also* Freeman v. Seligson, 132 U.S. App.D.C. 56, 69, 405 F.2d 1326, 1339 (1968).

**26.** *See generally* Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, D.D.C., 40 F.R.D. 318, 325 (1966); *cf.* Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The practical underpinnings of the need for pre-decisional privacy were well stated by Mr. Justice Reed in Kaiser Aluminum & Chemical Corp. v. United States, 157 F. Supp. 939, 945–946, 141 Ct.Cl. 38 (1958), where he pointed out: "Free and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act. Government from its nature has necessarily been granted a certain freedom from control beyond that given the citizen."

**27.** *See* Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 112, 280 F.2d 654, 660 (1960); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, *supra* note 26, 40 F.R.D. at 325–326. *See also* United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

**28.** 40 F.R.D. at 326. Similarly, in Kaiser Aluminum & Chemical Corp. v. United States, *supra* note 26, the Court of Claims stressed that the document the plaintiff unsuccessfully sought there in a breach

should apply only to "papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 797 (1967).

This limitation is supported by the House Committee Report on the Freedom of Information Act which stressed that "a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated *before it completes* the process of awarding a contract or issuing an order, decision or regulation. This clause [Exemption 5] is intended to exempt from disclosure this and other information and records wherever necessary without, at the same time, permitting indiscriminate administrative secrecy." H.R.Rep.No.1497, 89th Cong., 2d Sess., 10 (1966). (Emphasis added.) And the policies supporting Exemption

5 as well as its predecessor privilege—the practical need for privacy in the formulation of policy, avoiding misleading the public, and judging officials for what they actually decide rather than what they say or write to themselves beforehand—are not jeopardized when, after a decision has been communicated to the public by a decision-maker, a document whose whole purpose and effect, as with the Regional Board reports, here, are to support that decision is disclosed. *See* Note, The Freedom of Information Act and the Exemption for Intra-Agency Memoranda, 86 Harv.L.Rev. 1047, 1057–1061 (1973).

■ Thus for purposes of applying Exemption 5 we believe a distinction must be drawn between documents composed exclusively for purposes of assisting policy formulation and those which serve to reflect policy already made and announced.[29] *Cf.* Tennessean Newspa-

---

of contract suit against the Government was a "memorandum * * * written by a Special Assistant to the War Assets Liquidator. His duties, at least so far as the contracts here involved are concerned, were confined to recommendations and advice on program policy. He played no part in the operative events involved in this case and had no relations or discussions with plaintiff or its competitor." 157 F.Supp. at 943. But Mr. Justice Reed, speaking for the Court of Claims, noted that the claim of executive privilege there would rest on much weaker ground if the papers by the officials reflected actual, effective decisions: "If the Special Assistant played a part in operative events, *e. g.*, determination of costs or values, representations to Kaiser or Reynolds or survey of the plants, a different situation might exist. We therefore consider this case on the basis of a refusal by the Administrator to produce an advisory opinion on intra-office policy in relation to the sales to Kaiser and Reynolds." *Id.* at 944. *See also* United States v. Procter & Gamble Co., D.N.J., 25 F.R.D. 485, 489 (1960) (noting that the privilege should not apply when the Government document at issue "did not evidence an operative decision").

29. We believe the line we draw between "pre-decisional" and "decisional" docu-

ments is fully consistent with our decision in Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971). There we held that memoranda of the FTC staff, which, unlike the Regional Boards, is not assigned any decisional responsibility, were privileged under Exemption 5. In the circumstances of that case, it was clear that the staff memoranda were not meant or likely to reflect accurately the agency decisions in which the plaintiffs were interested. Moreover, the staff-produced papers were clearly drafted for "consultative" purposes: some of them were written before the FTC members approved a merger and some were written after the merger approval but before the FTC initiated proceedings against a second merger and served to compare the two mergers. Judge Tamm concluded that in such circumstances the dangers of misleading the public and embarrassing pre-decision communications between staff and decision-maker were apparent, and the FTC's invocation of Exemption 5 was proper. But he made clear that he agreed with the comment in Chief Judge Bazelon's concurring and dissenting opinion that if "the memoranda had been adopted as policy," 146 U.S.App.D.C. at 252 n. 8, 450 F.2d at 713 n. 8, the exemption should not apply. 146 U.S.App.D.C. at 245, 450 F.2d at 706. On similar

pers, Inc. v. FHA, *supra,* 464 F.2d at 660–661. Indeed, in view of our obligation "to delimit the exception as narrowly as consistent with efficient Government operation," EPA v. Mink, *supra,* 410 U.S. at 89, 93 S.Ct. at 837, *quoting* S.Rep. No. 813, 89th Cong., 1st Sess., 9 (1965), it is incumbent on us to enunciate such a limitation.[30] Of course, the line is not always a bright one. Some papers can serve both functions—assisting pre-decisional deliberation and unambiguously rationalizing announced decisions. For example, in American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696 (1969), what began as a staff memorandum in the pre-decisional stage was transformed into a document that had to be disclosed by the agency's admission in its publicly communicated order that its decision was based on the memorandum.

In other cases, the basis of the decision may not be so openly admitted. But the difficulty of line-drawing between documents that reflect only pre-decisional deliberation and those which reflect decisions communicated to the public should not eviscerate the principle. And the principle is a simple one: a document which a decision-maker treats as justification for a decision communicated outside the bureaucracy to

grounds *Sterling Drug* also held that two memoranda prepared by individual commissioners comparing the two mergers were not only purely consultative in nature, but were not likely to reflect fully the reasons either of the decision-makers voted to allow the previous merger. 146 U.S.App.D.C. at 246, 450 F.2d at 707.

Of course, neither of the kinds of documents *Sterling Drug* held were covered by Exemption 5 could fairly be termed decisional in the sense that they were treated as the end product of the decision-maker's deliberation and utilized to justify a decision openly taken. Disclosing papers of this sort, we have said, cannot be held to intrude on frank pre-decisional communications and deliberations whose exposure may be both misleading and embarrassing. Once there is solid reason to believe a paper is considered by a decision-maker to be the basis for his decision and utilized as a justifying document, it is clear the paper can no longer be said to demonstrate merely the preliminary deliberations of a decision-maker or his staff, on which publicity may have a future chilling effect, but acquires a more formal, finished status which a decision-maker should be more ready to have attributed to himself. *See* Note, The Freedom of Information Act and the Exemption for Intra-Agency Memoranda, 86 Harv.L.Rev. 1047, 1060–1061 (1973).

*Sterling Drug* certainly recognizes this distinction. Judge Tamm's panel opinion not only endorsed Chief Judge Bazelon's "adoption as policy" test. Equally important, the court ordered the District Court on remand to consider disclosure of documents issued by the FTC as a whole to private parties indicating its approval of the first merger. Judge Tamm noted that with material of this sort "the danger that any explanation they may give of [the initial merger] is not the correct one is greatly reduced. We also feel the policy of promoting the free flow of ideas within the agency does not apply here, for private transmittals of binding agency opinions and interpretations should not be encouraged." 146 U.S.App.D.C. at 247, 450 F.2d at 708. In our case, of course, the entire Regional Board reports are not ordinarily transmitted to regulated parties. But this difference is not crucial. *Sterling Drug*'s paramount significance for purposes of this case is its stress on two factors: the likelihood that the papers are accurate representations of what the decision-maker used as the basis for his action and the likelihood that distinctively pre-decisional communications will not be jeopardized. Put another way, this aspect of *Sterling Drug* and our decision today both deal with papers whose unmistakable effect is to indicate that the "free flow" of pre-decisional consultation has ceased and a decision has jelled.

30. This limitation is not the only well recognized limitation on Exemption 5. In EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Supreme Court, following the lead of Soucie v. David, *supra* note 11, and Bristol Myers Co. v. FTC, 138 U.S.App.D.C. 22, 424 F.2d 935 (1970), noted that even where a document does contain pre-decisional advice or recommendations it does not follow that the entire document may be suppressed. "[P]urely factual, investigative matters" also contained in the document may be disclosed under the Freedom of Information Act, so long as the advisory, policy-type materials are deleted. 410 U.S. at 87–94, 93 S.Ct. 827, 35 L.Ed.2d 119.

regulated parties should not be shielded from public disclosure on the ground that it was originally prepared for purposes of pre-decisional consultation, because the agency has customarily not disclosed the document, or because the agency labels the document other than what it really is. Therefore, since the Regional Board reports clearly reflect and are used to justify decisions of the Regional Board communicated to the contractors under scrutiny, they must fall outside the scope of Exemption 5 and should be disclosed as "identifiable records."

### III

■ Several weeks after the District Court's opinion rejecting the Government's argument that the documents Grumman sought should remain privileged under Exemption 5 was issued, the Government moved for rehearing under Rule 59, Fed.R.Civ.P., requesting the District Court to consider a formal claim of executive privilege by the chairman of the Renegotiation Board for the first time during the litigation. In our view, the District Court properly denied the motion for rehearing as untimely without considering its merits.

■ Ordinarily Rule 59 motions for either a new trial or a rehearing are not granted by the District Court where they are used by a losing party to request the trial judge to reopen proceedings in order to consider a new defensive theory which could have been raised during the original proceedings. Echevarria v. United States Steel Corp., 7 Cir., 392 F.2d 885, 892 (1968); Rue v. Feuz Construction Co., D. D.C., 103 F.Supp. 499, 502 (1952). *See also* 6A J. Moore, Federal Practice ¶ 59.07 (1972). The Government attempts to avoid applicability of this well established principle, one that is required for the orderly disposition of judicial business, by arguing that it had no "occasion" to raise the executive privilege claim before the District Court opinion was handed down.

■ ■ We disagree. First of all, the Government had sufficient "occasion" to raise all its legal claims long before the District Court took the case

under advisement. On remand from this court's original decision, the District Court ordered a deposition taken from the chairman of the Renegotiation Board to shed more light on the Board's decisional process to help the court determine whether the documents sought were final opinions. During the deposition proceedings the Board chairman argued, as the Government does here, that allowing production of the documents sought by Grumman would mean disclosure of what he felt were essentially advisory, consultative papers. But the Government chose not to argue executive privilege in the memorandum of points and authorities subsequently submitted to the court or in oral argument before the District Court. It could not have been unaware of the possible relevance of executive privilege to its case, for it did invoke Exemption 5 of the Freedom of Information Act. And the history and language of that exemption make clear that Congress did intend to codify at least some components of the executive privilege doctrine as it had been applied in pre-Freedom of Information Act cases. *See* Ackerly v. Ley, *supra,* 137 U.S.App.D.C. at 138, 420 F.2d at 1341. Since we cannot disturb the District Court's ruling on a Rule 59 motion absent a finding of abuse of discretion, *see* Atchison, Topeka & Santa Fe R. Co. v. Jackson, 10 Cir., 235 F.2d 390, 394 (1956); Mayer v. Higgins, 2 Cir., 208 F.2d 781 (1953); *see also* Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), plainly no reversal is called for.

We are asked to hold that the ordinary standards governing a District Court's decision on a Rule 59 motion have no application because of the unique nature of an executive privilege claim. Properly noting that executive privilege, like the narrower privilege against disclosure of military secrets, "is not to be lightly invoked," United States v. Reynolds, 345 U.S. 1, 7, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953), the Government says that it follows that the rule requiring clearly available defenses raised in time for trial

courts to pass on them in the normal course of proceedings has no place. We are given no reasoning or serious policy arguments to support this conclusion. Just because the assertion of executive privilege, with its constitutional overtones, is a matter of obvious gravity, *see* Soucie v. David, *supra,* 145 U.S.App.D.C. at 149, 448 F.2d at 1072, and like any constitutional claim should not be used to dispose of a case where a statutory claim can do equal service, it hardly follows that the Government should be allowed to play cat and mouse by withholding its most powerful cannon until after the District Court has decided the case and then springing it on surprised opponents and the judge. In saying this, we do not mean to suggest that this particular cannon, in the context of this case, is any more than a popgun. If the claim were indeed of such gravity as the Government now suggests, we can only wonder why the Government failed to· alert the District Court in a less extraordinary manner.

Affirmed.