LEE CONSTRUCTION CO., INC., etc.

v.

FEDERAL RESERVE BANK OF RICH-MOND and Provident Savings
Bank of Baltimore.

Civ. No. K–81–3090.

United States District Court,
D. Maryland.

Aug. 6, 1982.

166

Gerald S. Klein and Patricia A. Aluisi, Baltimore, Md., for plaintiff.

Edmund S. Dandridge, Jr., Charles M. Kerr, John H. Morris, Jr., and Venable, Baetjer & Howard, Baltimore, Md., for defendant Federal Reserve Bank of Richmond.

H. Thomas Howell, Thomas Waxter, Jr., Susan M. Ringler, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant Provident Sav. Bank of Baltimore.

FRANK A. KAUFMAN, Chief Judge.

In this case plaintiff Lee Construction Co. (Lee), a Maryland corporation with its principal place of business in Baltimore, Maryland, challenges the bidding procedures employed by the defendant Federal Reserve Bank of Richmond (Bank), a United States corporation with its principal office in Richmond, Virginia, and a branch office in Baltimore, in connection with the sale of certain real property located in Baltimore and

seeks equitable relief and damages. The Bank's instructions to bidders made it plain that no bids subject to financing contingencies would be acceptable. Lee alleges that it submitted the highest bid for the property, but that, after negotiation, the Bank ultimately rejected Lee's bid as nonqualifying because the bid was subject to mortgage financing. After rejecting Lee's nonqualifying bid, the Bank accepted the substantially lower bid of defendant Provident Savings Bank of Baltimore (Provident), a federally-chartered bank with its principal place of business in Baltimore.

In its Amended Complaint, Lee claims a right to seek review pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 702, of the Bank's actions in connection with the solicitation and consideration of the bids in question. Additionally, Lee seemingly claims that the Bank breached a duty purportedly imposed by § 4 of the Federal Reserve Act of 1913 (Act),[1] 12 U.S.C. § 341, "to act in a prudent and responsible manner in the conduct of its business affairs."

Both the Bank and Provident have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted on the grounds (1) that Lee lacks standing to seek judicial review of the Bank's actions under the APA and (2) that Lee otherwise fails to state a claim upon which relief can be granted.

## ALLEGATIONS OF FACT

For the purposes of considering defendants' motions to dismiss, the allegations of Lee's Amended Complaint are accepted as true and construed herein in the light most favorable to Lee.

During early 1981 the Bank gave public notice that it would sell, by way of public bid, the building and real property owned by the Bank located at the northwest corner of Calvert and Lexington Streets in Baltimore. Bid documents were made available to the public.

The Invitation to Bid and accompanying documents set forth the conditions with which each bidder was required to comply in order to have its bid considered by the Bank. Paragraph 7 of the Invitation to Bid stated: "The Bank reserves the right to reject any and all bids received and undertakes no obligations to sell by reason of this offering or any response to it."

Accompanying the Invitation to Bid were the Instructions to Bidders (bid instructions). Paragraph 1.4 of the bid instructions defined a "bidder" as, *inter alia,* "any corporation ... submitting a bid." Paragraph 1.3 defined a "bid" as "a complete and properly executed Bid Form to purchase the Property made in accordance with the Bid Documents and accompanied by the deposit required by Paragraph 3.3." The "Bid Documents" were defined in paragraph 1.2 as, *inter alia,* "the Invitation to Bid, the Instructions to Bidders, the Bid Form, [and] the Contract between the Bank and the successful bidder." Paragraph 3.3 of the bid instructions provided that each bid had to be accompanied by a certified check in the amount of $25,000. Paragraph 4.2 stated:

> The Bank shall have the right to reject any and all bids, to accept a bid from other than the highest bidder, to negotiate with any bidder on the terms of his bid, or to take any other action with respect to any bid which it in its sole discretion may deem proper under the circumstances.

The Bid Form required to be submitted by all bidders and the Bid Form actually executed by Lee provided that each bidder specifically agreed that the Bank had the rights set forth in said paragraph 4.2. Further, paragraph 4.3 provided that "[t]he Bank shall have the right to waive any formality or irregularity in any bid received."

The bid instructions further provided in paragraph 5.1 for the form of contract of sale to be executed between the Bank and the successful bidder and paragraph 5.2 provided that no substitute contract forms

---

1. Codified principally at 12 U.S.C. §§ 221 to 522, inclusive.

would be permitted or accepted. As Lee admits in paragraph 9 of its Amended Complaint, the form of contract of sale required by the Bank "allowed no financing contingencies."

Finally, paragraph 11.2 of the bid instructions provided: "The Bank shall not be liable for any costs or expenses incurred by bidders in the preparation and/or submission of bids."

On February 16, 1981, Lee submitted a bid for $4.3 million which materially failed to comply with the bid instructions in two respects: (1) the bid was expressly made "contingent upon [Lee's] ability to obtain a mortgage in the amount of $3,870,000.00 at an interest rate of twelve (12%) percent for a term of 28 years 7 months" and (2) the bid was not accompanied by a certified check in the amount of $25,000 (although the bid was accompanied by an uncertified check in that amount). After the submission of Lee's bid, the Bank also learned from the Department of Assessments and Taxation of the State of Maryland that Lee's charter had been annulled on February 8, 1980.

Despite these deficiencies, the Bank entertained Lee's bid and in a letter dated February 27, 1981, the Bank set forth three conditions which Lee would have to meet and the dates by which Lee must comply before the Bank would consider Lee's bid: (1) Lee's corporate status would have to be clarified by March 6, 1981; (2) the certified check in the amount of $25,000 required by the bid instructions would have to be provided to the Bank by March 6, 1981; and (3) Lee would have to provide, by March 27, 1981, the Bank with a written commitment for the mortgage financing upon which Lee's bid was contingent.

After receipt of the Bank's February 27, 1981 letter, the President of Lee met on March 9, 1981, with certain representatives of the Bank to discuss the conditions set forth in the Bank's said February 27, 1981 letter. The President of Lee apparently requested an extension of time to procure the written financing commitment required by the Bank. By letter dated March 16, 1981, the Bank indicated that Lee would

have to submit the written commitment by March 27, 1981, as originally stated in the Bank's February 27, 1981 letter, in order for Lee's bid to be entertained by the Bank.

By letter dated March 17, 1981, Lee informed the Bank that Lee had complied with the first two conditions stated in the Bank's February 27, 1981 letter, i.e., (1) Articles of Revival had been approved by the State Department of Assessments and Taxation and (2) Lee submitted to the Bank a certified check in the amount of $25,000. Further, in that same March 17, 1981 letter, Lee again asked for an extension of time in which to secure the written financing commitment. In a letter dated April 2, 1981, however, the Bank reaffirmed the position stated in its March 16, 1981 letter that an extension of time beyond March 27, 1981 could not be granted. Accordingly, since Lee had not submitted by March 27, 1981 a written commitment for the mortgage financing upon which Lee's bid was contingent, the Bank informed Lee that "we must consider your offer a nonqualifying bid and we cannot accept it." Thereafter, the Bank accepted Provident's bid of $2.8 million—a bid substantially lower than Lee's conditional bid of $4.3 million.

Herein, Lee contends that the actions of the Bank were arbitrary, capricious and contrary to government procurement regulations and that the award of the bid to Provident was without any rational basis. Lee further claims that the Bank breached a duty imposed by its enabling legislation, 12 U.S.C. § 341, and owed to a bidder such as Lee and to the public to act "in a reasonable and prudent manner in the conduct of the bidding process." In that regard Lee asserts that because the terms and conditions of the bid instructions imposed requirements on or restricted the form of bids, the Bank's actions "raised economic inhibitions to prospective bidders" and either deterred such bidders from bidding at all or reduced the amount such bidders were able to offer for the property. Lee alleges that had the Bank made it generally known to all prospective bidders that it would entertain bids such as Lee's which were sub-

ject to financing contingencies and unaccompanied by the required certified check, actual bidders might have offered more for the property and prospective bidders might have made bids that otherwise would not have been made. By allegedly so inhibiting the bidding process, the Bank "invalidated the process and conducted its affairs in an unbusinesslike and imprudent manner in violation of the statutory mandate [of 12 U.S.C. § 341]."

Lee seeks declaratory relief, an injunction prohibiting the transfer of the property from the Bank to Provident, damages of $10 million and an order compelling the Bank to resolicit bids for the property.

On the merits, for reasons set forth *infra*, Lee clearly may not prevail. But the merit issues may not be reached until this Court, a federal district court with limited jurisdiction, examines first the existence, vel non, of subject-matter jurisdiction, *see Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), and then whether the Bank is an "agency" under the APA whose actions are reviewable in this Court, and also whether Lee possesses the requisite "standing" to proceed in this case.

## SUBJECT–MATTER JURISDICTION

█ Lee claims a right to seek judicial review of the Bank's actions in connection with the bidding process pursuant to 5 U.S.C. § 702, which provides in pertinent part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Even assuming that the Bank is a federal agency, a question discussed in detail *infra,* 5 U.S.C. § 702 is not an independent grant to the federal courts of subject-matter jurisdiction to review federal agency action. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977). Subject-matter jurisdiction with regard to Lee's claims against the Bank, however, does seemingly exist by virtue of the second paragraph of 12 U.S.C. § 632, which provides in pertinent part:

Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any Federal reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any Federal reserve bank which is a defendant in any such suit may, at any time before the trial thereof, remove such suit from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise·provided by law.

In *Federal Reserve Bank of Richmond v. Kalin,* 77 F.2d 50, 51 (4th Cir.1935), Judge Parker wrote that the above provision "in the broadest possible language gave the District Courts jurisdiction of all suits of a civil nature to which any Federal Reserve Bank might be a party, without any limitation whatever at to the amount involved," and that "it was doubtless the intention of Congress to grant full right of recourse to the federal courts to these institutions, which had become important agencies of the federal government in its control of banking and currency."

Seemingly, however, no such independent basis of jurisdiction exists with regard to Lee's claims against Provident. Lee makes no claim of wrongdoing on the part of Provident. Rather, it appears that Lee has joined Provident as a defendant in this action solely for purposes of insuring that Provident will be bound by any injunctive relief which Lee may obtain. Indeed, at a hearing held in open Court, counsel for Lee so stated. However, even for that limited purpose, there must be a basis for subject-matter jurisdiction with regard to Lee's claim against Provident. *See* 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2941, at 362–63 (1973).

█ Diversity jurisdiction is not present. Lee, a Maryland corporation with its principal place of business in Maryland, is a citizen of the state of Maryland for diversity purposes. Provident, a federally-chartered bank with its principal place of

business in Maryland, is also a citizen of the state of Maryland for diversity purposes, since for those purposes, a federally-chartered bank is a citizen of the state in which its principal place of business is located. *Landmark Tower Associates v. First National Bank of Chicago,* 439 F.Supp. 195, 196 (S.D.Fla.1977); *Iowa v. First of Omaha Service Corp.,* 401 F.Supp. 439, 442 (S.D. Iowa 1975); 28 U.S.C. § 1348.

■ Federal question jurisdiction would also seem to be lacking. Although Lee claims that it is entitled to injunctive relief against the Bank as a result of the Bank's alleged violations of federal law in connection with the bidding procedures, Provident is joined as a defendant solely because (a) its bid for the property in question was accepted by the Bank, (b) Lee seeks to enjoin the transfer of that property from the Bank to Provident and (c) Lee desires

Provident to be bound by such an injunction.

Lee, however, contends that this Court may exercise "pendent party" jurisdiction over Provident. Since the Supreme Court's decision in *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), in which the Supreme Court did not completely close the door on the exercise of pendent-party jurisdiction,[2] courts have generally followed what appears to add up to a three-step approach involving constitutional, statutory and discretionary considerations[3] for determining whether or not pendent-party jurisdiction may permissibly be exercised. First, under the test articulated in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the court must determine whether or not there is constitutional power under Art. III to hear the claim against the pendent party. In *Gibbs,* Justice Brennan, writing for the Court, stated (at 725, 86 S.Ct. at 1138) that

---

**2.** In a passage which Professors Wright, Miller and Cooper have called "[t]he heart of the Court's decision," 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567, at 351–52 (Cum.Supp.1980), Justice Rehnquist wrote:

> Resolution of a claim of pendent-party jurisdiction, therefore, calls for careful attention to the relevant statutory language. As we have indicated, we think a fair reading of the language used in § 1343, together with the scope of § 1983, requires a holding that the joinder of a municipal corporation, like the county here, for purposes of asserting a state-law claim not within federal diversity jurisdiction, is without the statutory jurisdiction of the district court.
>
> There are, of course, many variations in the language which Congress has employed to confer jurisdiction upon the federal courts, and we decide here only the issue of so-called "pendent party" jurisdiction with respect to a claim brought under §§ 1343(3) and 1983. *Other statutory grants and other alignments of parties and claims may call for a different result.* [Emphasis added.] When the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346, the argument of judicial economy and convenience can be coupled with the additional argument that *only* in a federal court may all of the claims be tried together. [Emphasis in original.] As we indicated at the outset of this opinion, the question of pendent-party jurisdiction is "subtle and complex," and we believe that it would be as

unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction. Two observations suffice for the disposition of the type of case before us. If the new party sought to be impleaded is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress itself in the statutes conferring jurisdiction has not expressly or by implication negated its existence.

*Aldinger v. Howard,* 427 U.S. 1, 17–18, 96 S.Ct. 2413, 2421–22, 49 L.Ed.2d 276 (1976) (footnotes omitted). Professors Wright, Miller and Cooper suggest that *Aldinger's* "cautious attitude . . . is likely to be read as a signal that courts should go slowly in exercising such jurisdiction." 13 C. Wright, A. Miller & E. Cooper, *supra,* at 352.

**3.** *See, e.g., North Dakota v. Merchants Nat'l Bank & Trust Co.,* 634 F.2d 368, 370–73 (8th Cir.1980) (en banc); *Ortiz v. United States,* 595 F.2d 65, 71–73 (1st Cir.1979); *Dumansky v. United States,* 486 F.Supp. 1078, 1087–89 (D.N. J.1980). *See also Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978) (determination of power to exercise pendent jurisdiction has both constitutional and statutory elements).

"[p]endent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim 'arising under ...' [federal law] and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" (Footnote omitted; emphasis in original.) Justice Brennan then articulated the test for determining whether or not such a relationship exists as follows (at *id.*):

> The federal claim must have substance sufficient to confer subject matter jurisdiction on the court.... The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues there is *power* in federal courts to hear the whole.

(Citation and footnote omitted; emphasis in original.)

Second, pursuant to *Aldinger,* the "court must satisfy itself not only that Art. III permits [pendent-party jurisdiction], but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." 427 U.S. at 18,

96 S.Ct. at 2422. Third, even if the constitutional and statutory elements of pendent party jurisdiction are satisfied, the exercise of such jurisdiction remains discretionary and the court must determine whether or not, in the light of "considerations of judicial economy, convenience and fairness to litigants," *Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139, it should exercise its discretion to hear the claim against the pendent party. In that regard, "[n]eedless decisions of state law should be avoided," *id.,* and "if the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."[4] *Id.* Further, "if it appears that the state issues substantially predominate ... the state claims may be dismissed without prejudice and left for resolution to state tribunals," *id.* at 726–27, 86 S.Ct. at 1139, and if there is "the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, ... jurisdiction should ordinarily be refused." *Id.* at 727, 86 S.Ct. at 1139.

Since *Aldinger,* many courts have exercised pendent-party jurisdiction when exclusive federal jurisdiction over the claim against another party is present,[5] as in Federal Tort Claims Act (FTCA) cases.[6] Other

**4.** Even though seemingly stated as a hard and fast rule, this statement in *Gibbs* has not been so applied by the lower federal courts. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567, at 451–52 & nn. 34–35 (1975). Herein, there are no state law issues and the same reasons for granting the Bank's motion to dismiss would call for the denial of the injunctive relief requested against Provident. Therefore, the exercise of pendent-party jurisdiction over Provident will, in any event, not offend the above-stated principle enunciated in *Gibbs.*

**5.** "When the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346, the argument of judicial economy and convenience can be coupled with the additional argument that *only* in a federal court may all of the claims be tried together." *Aldinger,* 427 U.S. at 18, 96 S.Ct. at 2422 (emphasis in original).

**6.** *See, e.g., Ortiz v. United States,* 595 F.2d 65 (1st Cir.1979); *Obenshain v. Halliday,* 504

F.Supp. 946, 951–52 (E.D.Va.1980); *Ausland v. United States,* 488 F.Supp. 426, 429–30 (D.S.D. 1980); *Dumansky v. United States,* 486 F.Supp. 1078 (D.N.J.1980); *Pearce v. United States,* 450 F.Supp. 613 (D.Kan.1978); *Maltais v. United States,* 439 F.Supp. 540 (N.D.N.Y.1977). *See also Wood v. Standard Products Co.,* 456 F.Supp. 1098 (E.D.Va.1978) (court held that requirements of pendent-party jurisdiction were satisfied with regard to both general maritime law and FTCA claims). *But see Ayala v. United States,* 550 F.2d 1196, 1200 (9th Cir. 1977) (court refused to exercise pendent-party jurisdiction in FTCA case, stating "we conclude here that we are not bound by [the] dictum in *Aldinger*"), *cert. dismissed,* 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). The Ninth Circuit has consistently refused to exercise pendent-party jurisdiction. *See Aldinger v. Howard,* 513 F.2d 1257, 1259–62 (9th Cir.1975), *aff'd,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

courts have done the same in Federal Employer's Liability Act (FELA) cases [7] where jurisdiction is concurrent in the federal and state courts, and in other contexts.[8]

■ Applying the above three-step approach to the facts of the within case, it would appear to be within this Court's constitutional power to exercise pendent-party jurisdiction over Lee's claim for injunctive relief against Provident. Lee's claims are substantial in the jurisdictional sense, *see, e.g., A.H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 20 n. 10 (2d Cir.) (and cases cited thereat), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968), and "derive from a common nucleus of operative fact" since Lee's entitlement to injunctive relief against either defendant depends upon proof of the same set of facts. Thus, a plaintiff would ordinarily be expected—and indeed encouraged—to join in one action all parties whom plaintiff desires to be bound by injunctive relief.

As to the statutory inquiry mandated by *Aldinger,* the statute conferring subject-matter jurisdiction upon this Court with regard to Lee's claims against the Bank, *i.e.,* 12 U.S.C. § 632, *supra,* does not expressly or impliedly negate the existence of pendent-party jurisdiction. Whether that statute confers exclusive or concurrent jurisdiction over the Bank as defendant herein, it in no way suggests that in creating the anchor of federal jurisdiction over the Bank, Congress was excluding the joining in a federal suit of a defendant such as Provident.

Finally, the *Gibbs* discretionary factors appear to be met. To begin with, in terms of judicial economy and convenience, it makes sense to have all parties, against whom injunctive relief is sought, before the court at one time. Second, in terms of fairness, it would seem fair to Lee, which desires Provident to be bound by any injunctive relief to which Lee may prove itself entitled, to have Provident joined as a defendant. As to Provident, it of course has an important interest at stake in the property in question. Just as Lee may desire Provident to be bound by any injunctive relief granted herein, it is hardly inattractive to Provident to have Lee bound in terms of *res judicata* by any denial by this Court of the injunctive relief prayed for herein. As to the Bank, it would not appear in any way prejudiced by Provident's presence as a defendant, and the Bank has not so contended. It is also to be noted that since the law to be applied is federal, this Court will not have to decide, because Provident is in the case, any "needless questions of state law." Additionally, since this case is nonjury, there is no possibility that a jury will be confused if this case should go to trial. Accordingly, pendent-party jurisdiction over Provident will be exercised.

## APPLICABILITY OF 5 U.S.C. § 702

5 U.S.C. § 702 affords a right of judicial review only to persons claiming injury as a result of "agency action." The question arises as to whether the Bank is an "agency" subject to the provisions of the APA. As far as this Court knows, that question has not been decided to date in any reported case. "The law on the simple question of what is an agency is quite complex." 1 K. Davis, *Administrative Law Treatise* § 1:2, at 3 (2d ed. 1978) [hereinafter cited as Davis (2d ed.)]. "[A]ny general definition can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done.... The unavoidable fact is that each new arrange-

---

7. *See, e.g., Philipson v. Long Island R.R.,* 90 F.R.D. 644, 645 (E.D.N.Y.1981); *DeMaio v. Consolidated Rail Corp.,* 489 F.Supp. 315, 316 (S.D.N.Y.1980). *But see Letmate v. Baltimore & Ohio R.R.,* 311 F.Supp. 1059, 1062 (D.Md. 1970) (Kaufman, J.) (pre-*Aldinger* decision).

8. *See, e.g., North Dakota v. Merchants Nat'l Bank & Trust Co.,* 634 F.2d 368, 370–74 (8th Cir.1980) (en banc) (suit by State of North Dakota joined five national banks as defendants); *Boudreaux v. Puckett,* 611 F.2d 1028, 1030–31 (5th Cir.1980) (state law claim against surety joined with federal and state law claims against car dealer); *Ford Motor Co. v. Wallenius Lines,* 476 F.Supp. 1362, 1369–70 (E.D.Va. 1979) (admiralty jurisdiction present over one defendant but not the other).

ment must be examined anew and in its own context." *Washington Research Project, Inc. v. HEW,* 504 F.2d 238, 246–47 (D.C.Cir.1974) (McGowan, J.) (citations omitted), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).

The term "agency" for purposes of the APA is defined, with certain exclusions not relevant herein, in 5 U.S.C. § 551(1) to mean "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." The same definition of "agency" is repeated verbatim in 5 U.S.C. § 701(b)(1). Courts and commentators have taken differing approaches to the interpretation of the APA definition of "agency."

Professor Davis, characterizing the APA definition as "not very satisfactory," has defined an "agency" as "a governmental authority, other than a court and other than a legislative body, which affects the rights of private parties through either adjudication or rulemaking." 1 K. Davis, *Administrative Law Treatise* § 1.01, at 1 & n. 1 (1958).[9]

Another commentator has stated: "Where a center of gravity lies, where substantial 'powers to act' with respect to individuals are vested, there is an administrative agency for purposes of the APA.... [However,] a definition stated thus broadly is not self-applying. It is an abstract proposition that does not neatly decide concrete cases." Freedman, *Administrative Procedure and the Control of Foreign Direct Investment,* 119 U.Pa.L.Rev. 1, 9–10 (1970).

Some courts have indicated that the test for determining whether or not a particular entity is an "agency" for purposes of the APA is the same standard articulated by Judge Pope in *Lassiter v. Guy F. Atkinson Co.,* 176 F.2d 984, 991 (9th Cir.1949), a case involving the question of whether or not

the War Department and its subdivisions were "agencies of the United States" within the meaning of the Portal-to-Portal Act: "The authority to act with the sanction of government behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative of the question of whether it is an agency ...."[10] *See Ellsworth Bottling Co. v. United States,* 408 F.Supp. 280, 282 (W.D.Okla.1975); *W.B. Fishburn Cleaners, Inc. v. Army & Air Force Exchange Service,* 374 F.Supp. 162, 164 (N.D.Tex.1974). In both *Ellsworth* and *Fishburn,* the issue was whether or not the Army and Air Force Exchange Service (AAFES) was an "agency" within the meaning of the APA. Under the Tucker Act, 28 U.S.C. § 1346(a)(2), "an express or implied contract with the [AAFES] shall be considered an express or implied contract with the United States." Further, under the Supplemental Appropriations Act, 31 U.S.C. § 724a, "any judgment or compromise settlement against the United States arising out of an express or implied contract with the [AAFES] ... shall be paid" by the United States out of the Treasury, subject to reimbursement by the AAFES. Noting, *inter alia,* those facts, the courts in both *Ellsworth* and *Fishburn* held that the AAFES acts "with the sanction of government behind it" and is an "agency" for purposes of the APA.

In *Soucie v. David,* 448 F.2d 1067 (D.C. Cir.1971), Chief Judge Bazelon considered the question of whether or not the Office of Science and Technology (OST) was an "agency" for purposes of the Freedom of Information Act (FOIA). At the time of Judge Bazelon's opinion in *Soucie,* the definition of "agency" for purposes of the FOIA was the same as the definition for the APA generally set forth in 5 U.S.C.

**9.** Judge Wright suggests, however, that Professor Davis's definition "is probably itself too narrow." *Grumman Aircraft Eng'g Corp. v. Renegotiation Board,* 482 F.2d 710, 714 n. 13 (D.C.Cir.1973), *rev'd on other grounds,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

**10.** *See also Kam Koon Wan v. Black,* 188 F.2d 558, 561 (9th Cir.) (military governor of Hawaii held to be "agency of the United States" within meaning of Portal-to-Portal Act), *cert. denied,* 342 U.S. 826, 72 S.Ct. 49, 96 L.Ed. 625 (1951).

§ 551(1), *supra*.[11] Judge Bazelon wrote (448 F.2d at 1073):

> The statutory definition of 'agency' is not entirely clear, but the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions. While the primary purpose of the APA is to regulate processes of rule making and adjudication, administrative entities that perform neither function are nevertheless agencies, and therefore subject to the public information provisions of the APA, *i.e.,* the Freedom of Information Act.

(Footnotes omitted.) In addition to advising and assisting the President with regard to achieving coordinated federal policies in science and technology (in which capacity the OST might arguably be functioning as "merely staff to the President," *id.* at 1073), the OST also was responsible for evaluating scientific research programs of various federal agencies. Judge Bazelon concluded (*id.* at 1075): "By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency subject to the APA and the Freedom of Information Act."

In a context somewhat analogous to the instant situation, Judge Wright held that Regional Boards, wholly apart from the National Renegotiation Board (National Board) to which such Regional Boards were subordinate,[12] were "agencies" within the meaning of 5 U.S.C. § 551(1) and thus subject to the disclosure requirements of the FOIA. *Grumman Aircraft Engineering Corp. v. Renegotiation Board,* 482 F.2d 710 (D.C.Cir.1973), *rev'd on other grounds,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). Judge Wright, relying in part on Judge Bazelon's formulation in *Soucie,* concluded (482 F.2d at 715) that the Regional Boards had "substantial independent authority." Judge Wright also referred to the approach proposed by Professor Freedman and the latter's contention "that the primary task in applying the term 'agency' is 'to identify centers of gravity of the exercise of administrative power * * where substantial 'powers to act' with respect to individuals are vested.'" *Id.* at 715 (quoting Freedman, *supra,* 119 U.Pa.L.Rev. at 9). Judge Wright concluded that the Regional Boards satisfied this definition as well because they "have their own investigating and negotiating personnel with whom the contractors are instructed to discuss their excess profit liability prior to decision of their cases by the Regional Boards." *Id.* (footnote omitted). Further, Judge Wright noted that the Regional Boards made "formal recommendation[s] as to the contractor's excess profit liability" and were "empowered to make final decisions not even reviewable by the National Board." *Id.* In sum, Judge Wright concluded that "the Regional Boards serve as a discrete, decision-producing layer in the renegotiation process." *Id.*

Judge Wright also considered it significant that Congress contemplated the cre-

---

11. In 1974 Congress added a new definition of "agency" solely for purposes of the FOIA (as distinct from the APA as a whole) codified as 5 U.S.C. § 552(e), which amends the definition of "agency" set forth in 5 U.S.C. § 551(1). Pub.L. No. 93–502, § 3, 88 Stat. 1561, *reprinted in* 1974 U.S.Code Cong. & Ad.News 1798, 1802; H.R.Rep. No. 876, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6267, 6274; Conf.Rep. No. 1200, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6285, 6293. The new definition provides:

> For purposes of this section [5 U.S.C. § 552], the term "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(e). The Conference Report stated that the conferees intended "to include within the definition of 'agency' those entities encompassed by 5 U.S.C. § 551 and other entities including the United States Postal Service, the Postal Rate Commission, and government corporations or government-controlled corporations now in existence or which may be created in the future." Conf.Rep. No. 1200, *supra,* U.S. Code Cong. & Admin.News 1974, p. 6293.

12. For the relevant statutory provisions, see 50 U.S.C.App. §§ 1211 to 1224, and particularly § 1217 thereof which creates the Renegotiation Board.

ation of and the delegation of formal decision-making power to the Regional Boards by the National Board.[13] *Id.* at 715–16. Judge Wright further noted that the court's conclusion that the Regional Boards were agencies subject to the FOIA was corroborated by the National Board's own regulations subjecting "to the requirements of the Freedom of Information Act documents that represent administrative actions whether taken by the National Board or exclusively by the Regional Boards."[14] *Id.* at 716.

By contrast, in *Washington Research Project, Inc. v. HEW,* 504 F.2d 238 (D.C.Cir. 1974), Judge McGowan held that so-called "initial review groups" (IRG's), *id.* at 242, groups composed almost entirely of nongovernmental consultants whose sole function was to evaluate research proposals in applications for grants and to make recommendations to the National Advisory Mental Health Council (NAMHC) (which in turn made a recommendation to the Secretary of HEW as to whether or not to award the grant), were not "agencies" for purposes of the APA or the FOIA. Judge McGowan wrote (*id.* at 248): "The important consideration is whether it [an IRG] has any authority in law to make decisions." Judge McGowan concluded that the IRG's had no authority to make decisions, but only to make recommendations to the NAMHC, the authority to make grants being vested in the Secretary and the authority to recommend that the Secretary so do being vested in the NAMHC.

In *Rocap v. Indiek,* 539 F.2d 174 (D.C.Cir. 1976), Judge Tamm concluded that the Federal Home Loan Mortgage Corporation (Corporation) was a "Government controlled corporation" and therefore an "agency" within the meaning of the amended definition of that term for purposes of the FOIA contained in 5 U.S.C. § 552(e).[15] Judge Tamm concluded (539 F.2d at 180–81):

> The organizational structure of the Corporation exhibits many characteristics similar to those of other governmental entities subject to the Freedom of Information Act. It is federally chartered, its Board of Directors is Presidentially appointed, it is subject to close governmental supervision and control over its business transactions, and to federal audit and reporting requirements. In addition, the Corporation is expressly designated an "agency," and its employees are officers and employees of the United States, for a number of purposes. Like other agencies, it is empowered "to make and enforce such bylaws, rules, and regulations as may be necessary or appropriate to carry out the purposes or provisions of [its enabling act]" 12 U.S.C. § 1452(b)(3).

> The existence of any one of these characteristics, by itself, would not be sufficient to trigger applicability of section 552(e), but these are the kinds of indicia of federal involvement and control which courts have generally relied upon in determining whether an entity is a federal agency. Taken together, we believe that the Corporation's federal characteristics dictate the conclusion that is the kind of federally created and controlled entity which Congress sought to bring within the scope of the "Government controlled corporation" language of 5 U.S.C. § 552(e).

**13.** 50 U.S.C.App. § 1217(d) provides in pertinent part:

The Board may delegate in whole or in part any function, power, or duty (other than its power to promulgate regulations and rules and other than its power to grant permissive exemptions ...) to any agency of the Government, including any such agency established by the Board, and may authorize the successive redelegation, within limits specified by it, of any such function, power, or duty to any agency of the Government, including any such agency established by the Board.

**14.** In *Soucie* Judge Bazelon deemed it significant that the OST had, prior to that litigation, published FOIA regulations, thereby indicating that OST considered itself to be an agency subject to the APA. *Soucie,* 448 F.2d at 1075.

**15.** *See* note 11 *supra.*

The foregoing cases teach the need in a case such as this for this Court to review the organizational structure of Federal Reserve Banks and their function within the Federal Reserve System in order to determine whether or not such Banks possess sufficient indicia of "agency" status to be considered agencies for purposes of the APA.

"Each Federal Reserve Bank is a separate legal entity, created pursuant to the Federal Reserve Act and operating under the general supervision of the Board [of Governors of the Federal Reserve System (Board)]." Rules of Organization of the Federal Reserve System, 26 Fed.Reg. 12638 (as revised effective Nov. 2, 1976); 12 U.S.C. § 222. *See* 12 U.S.C. §§ 248(j) & 341. The Act establishes each Federal Reserve Bank as a federally-chartered corporation with the powers, *inter alia,* to act in its own name: (1) to make contracts; (2) to sue and be sued in any court of law or equity; (3) to prescribe its own by-laws; and (4) to exercise all powers specifically granted by the Act and all incidental powers necessary to carry on the business of banking pursuant to that Act. Further, the legislative history of the Act seemingly indicates that Congress envisioned that with regard to routine, day-to-day banking operations the Federal Reserve Banks would be relatively free of any direct control by the Board.[16]

Each Federal Reserve Bank is under the direct supervision and control of a board of nine directors, six of whom are elected by the member banks in the relevant Federal Reserve District and three of whom are appointed by the Board. 12 U.S.C. §§ 301 & 302. The Federal Reserve Banks receive no appropriated funds from Congress. Rather, each Federal Reserve Bank is a private corporation owned by private stockholders who have made the required capital contributions, *i.e.,* by the national banks in its district, which are required to become members of the Federal Reserve System and to subscribe to the stock of such Federal Reserve Bank, 12 U.S.C. §§ 222, 282 & 466, by state-chartered banks which choose (subject to the approval of the Board) to become members of the system, 12 U.S.C. § 321, and in certain instances and under

---

**16.** H.R.Rep. No. 69, 63d Cong., 1st Sess. 18–19 (1913) stated:

It will be observed that in what has just been said the reserve banks have been spoken of as if they were a unit. The committee, however, recommends that they shall be individually organized and individually controlled, each holding the fluid funds of the region in which it is organized and each ordinarily dependent upon no other part of the country for assistance. The only factor of centralization which has been provided in the committee's plan is found in the Federal reserve board, which is to be a strictly Government organization created for the purpose of inspecting existing banking institutions and of regulating relationships between Federal reserve banks and between them and the Government itself. Careful study of the elements of the problem has convinced the committee that every element of advantage found to exist in cooperative or central banks abroad can be realized by the degree of cooperation which will be secured through the reserve-bank plan recommended, while many dangers and possibilities of undue control of the resources of one section by another will be avoided. Local control of banking, local application of resources to necessities, combined with Federal supervision, and limited by Federal authority to compel the joint application of bank resources to the relief of dangerous or stringent conditions in any locality are the characteristic features of the plan as now put forward. The limitation of business which is proposed in the sections governing rediscounts, and the maintenance of all operations upon a footing of relatively short time will keep the assets of the proposed institutions in a strictly fluid and available condition, and will insure the presence of the means of accommodation when banks apply for loans to enable them to extend to their clients larger degrees of assistance in business. It is proposed that the Government shall retain a sufficient power over the reserve banks to enable it to exercise a directing authority when necessary to do so, but that it shall in no way attempt to carry on through its own mechanism the routine operations of banking which require detailed knowledge of local and individual credit and which determine the actual use of the funds of the community in any given instance. In other words, the reserve-bank plan retains to the Government power over the exercise of the broader banking functions, while it leaves to individuals and privately owned institutions the actual direction of routine.

certain limitations by private individuals or entities. 12 U.S.C. § 283. The net earnings of each Federal Reserve Bank, after all necessary expenses have been paid or provided for, are allotted first to the payment of a statutorily-prescribed dividend of 6% [17] and second to the surplus fund of such Federal Reserve Bank. 12 U.S.C. § 289. After "the surplus of each Federal Reserve Bank is increased by the amount needed to maintain its surplus equal to its paid-in capital stock, all remaining earnings are paid to the United States Treasury as interest on Federal Reserve Notes.... 12 U.S.C. § 414; Board of Governors of the Federal Reserve System, *Annual Report* 298 (1979)." 4 F. Solomon, W. Schlichting, T. Rice & J. Cooper, *Banking Law* § 77.02, at 77–7 n. 10 (1982) [hereinafter cited as *Banking Law*]. If a Federal Reserve Bank is liquidated, "any surplus remaining, after the payment of all debts, dividend requirements ... and the par value of the stock" is also paid into the Treasury. 12 U.S.C. § 290.

However, despite the ostensibly private ownership of Federal Reserve Banks and despite the private election of six of the nine members of the board of directors of each Bank, the affairs of each Federal Reserve Bank are conducted under the close supervision and ultimate control of the Board, an independent federal regulatory agency.[18] For example, the Board is authorized "[t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank ... and to require such statements and reports as it may deem necessary," 12 U.S.C. § 248(a), "[t]o suspend or remove any officer or director of any Federal reserve bank," *id.* § 248(f), "[t]o suspend, for the violation of any of the provi-

sions of [the Act], the operations of any Federal reserve bank, to take possession thereof, administer the same during the period of suspension, and, when deemed advisable, to liquidate or reorganize such bank," *id.* § 248(h), and "[t]o exercise general supervision over [the] Federal reserve banks," *id.* § 248(j). Any compensation paid to directors of Federal Reserve Banks is subject to the approval of the Board. *Id.* § 307. Although the president of each Federal Reserve Bank is appointed by its board of directors, such appointment is subject to approval by the Board itself. *Id.* § 341, Fifth. The Board may require a Federal Reserve Bank to establish one or more branch banks within its district, such branches to be operated by a board of directors "subject to such rules and regulations as the Board ... may prescribe." *Id.* § 521. The Board "may at any time require any Federal reserve bank to discontinue any branch of such Federal reserve bank" and any construction of branch bank buildings by any Federal Reserve Bank is subject to the approval of the Board. *Id.* § 521.

The Act authorizes the Board "[t]o delegate, by published order or rule and subject to the Administrative Procedure Act, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to one or more administrative law judges, members or employees of the Board, or Federal Reserve banks." *Id.* § 248(k). Pursuant to this authority the Board has extensively delegated its functions and its authority to the Federal Reserve Banks. *See* 12 C.F.R. §§ 265.-2(f)(1)–(48) (1981). "For example, 80 percent of all applications under the Bank

---

**17.** Because of this low statutory dividend and, more importantly, because banks which are members of the Federal Reserve System are required to subscribe to the stock of the Federal Reserve Bank in whose district they are located, it appears that the stock of Federal Reserve Banks, unlike stock in a private corporation, is not acquired for investment purposes. Further, because member banks are required to subscribe and because the Board has ultimate control over the operations of each Federal Reserve Bank, stock in Federal Reserve Banks,

unlike stock in a private corporation, is seemingly not acquired for purposes of control. Rather, such stock is acquired because its "ownership" is "a condition of membership in the Federal Reserve System." *See* 4 F. Solomon, W. Schlicting, T. Rice & J. Cooper, *Banking Law* § 77.02, at 77–6 to 77–7 (1982) [hereinafter cited as *Banking Law*].

**18.** *See, e.g.,* 12 U.S.C. §§ 248(a)–(j), 301, 307, 341, 485 & 521.

Holding Company Act were acted on under delegated authority in 1979. Board of Governors of the Federal Reserve System, *Annual Report* 278 (1979)." 4 *Banking Law* § 77.03[5], at 77–21 n. 5. Among the functions delegated by Board is the authority "[t]o sell real property (prior consultation with the Director of the Division of Federal Reserve Bank Operations is required for any property appraised at more than $1,000,000)." 12 C.F.R. § 265.2(f)(38) (1981).

The Board's Rules of Procedure, 12 C.F.R. § 262 (1981), indicate that many applications for the approval of action by the Board are to be filed with and acted upon pursuant to delegated authority by a Federal Reserve Bank. In most instances "[a]ny application, request, or petition (hereinafter referred to as 'application') for the approval, authority, determination, permission of the Board with respect to any action for which such approval, authority, determination, or permission is required by law or regulation of the Board (including actions authorized to be taken by a Federal Reserve Bank . . . on behalf of the Board pursuant to authority delegated under Part 265 of this chapter)," *id.* § 262.3(a), is filed with "the Federal Reserve Bank of the district in which the head office of the parent banking organization is located," *id.* § 262.3(c). Thereafter, "[i]n every case, the Reserve Bank makes such investigation as may be necessary, and, *except when acting pursuant to delegated authority,* reports the relevant facts, with its recommendation, to the Board." *Id.* § 262.3(d) (emphasis added). With regard to action on applications, the regulations provide:

> The Board takes such action as it deems appropriate in the public interest. Such documents as may be necessary to carry out any decision by the Board are prepared by the Board's staff. *With respect to actions taken by a Federal Reserve Bank on behalf of the Board under delegated authority, statements and necessary documents are prepared by the staff of such Federal Reserve Bank.*

*Id.* § 262.3(f) (emphasis added).

Actions taken at a delegated level are subject to review by the Board. 12 U.S.C. § 248(k). The Board has promulgated a regulation with regard to such review which provides in pertinent part as follows:

> Any action taken at a delegated level shall be subject to review by the Board only if such review is requested by a member of the Board either on the member's own initiative or on the basis of a petition for review by any person claiming to be adversely affected by the action. Any such petition for review must be received by the Secretary of the Board not later than the fifth day after the date of such action.

12 C.F.R. § 265.3 (1981).

In sum, the Board has delegated substantial decision-making authority to the Federal Reserve Banks. Thus, Federal Reserve Banks seemingly possess "substantial independent authority in the exercise of specific functions," *Soucie, supra,* 448 F.2d at 1073, and seemingly have "authority in law to make decisions." *Washington Research Project, supra,* 504 F.2d at 248. Like the Regional Boards considered in *Grumman,* the Federal Reserve Banks would appear to be vested with "substantial 'powers to act' with respect to individuals" and to function "as a discrete, decision-producing layer." *Grumman, supra,* 482 F.2d at 715. And since the language of the APA itself provides that an "agency" is "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," a Federal Reserve Bank may be considered such an "agency" even though its actions may be subject to review by the Board.[19]

Unlike the Federal Home Loan Mortgage Corporation (FHLMC) considered in *Rocap,*

---

19. The question of whether Lee's claims herein fail because of failure to exhaust any possible review by the Board, *see generally* B. Mezines, J. Stein & J. Gruff, *Administrative Law* §§ 49.01 & 49.02 (1982), has not been discussed or even suggested by any of the parties and will not be reached herein in view of this Court's conclusions, stated herein, with regard to Lee's lack of standing and Lee's failure to allege claims upon which relief can be based.

however, Federal Reserve Banks have no power to make or enforce any rules or regulations. They are seemingly not designated as agencies for any purpose. Their officers and employees are apparently not officers and employees of the United States (*see* 12 U.S.C. § 341, Fifth) and the members of their boards of directors are not presidentially-appointed (*see id.* § 302). Like the FHLMC, however, Federal Reserve Banks are federally-chartered (*see id.* § 341); are subject to close governmental supervision and control (by the Board); and are subject to examination by the Board and reporting requirements imposed by the Board (*see id.* §§ 248(a) & 485).

Further, unlike the AAFES whose status was at issue in *Ellsworth* and *Fishburn*, Federal Reserve Banks, while possessing power to contract in their own names, do not have power to contract in the name of the United States. Thus, seemingly any judgment or settlement against a Federal Reserve Bank would be paid by it out of its own funds, not by the United States Treasury.

■ All in all, while the issue is a close one, it would seem that a consideration of each and every one of the relevant factors tips the balance in favor of holding that the Bank is an "agency" for purposes of judicial review under the APA. For the most part, that conclusion comports with the decisions of other Courts which have held that Federal Reserve Banks are agencies or instru-

mentalities of the United States for other purposes.[20]

■ In order for the review provision of 5 U.S.C. § 702 to be applicable, it is not only necessary that the appeal be taken from the action of an "agency," but also that the person claiming injury must have suffered such injury as a result of "agency action." The words "agency action" are defined in 5 U.S.C. § 551(13) to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." "Order" is defined to "mean[ ] the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6). It thus appears that the action of an agency in awarding a contract for the sale of real property pursuant to an invitation for bids would be a "final disposition" within the meaning of the APA's definition of "order" and thus would be "agency action" for purposes of the APA. This conclusion is corroborated by the numerous instances, some of which are discussed *infra* in connection with standing, in which courts have reviewed under the APA the conduct of agencies in connection with the solicitation of bids and the award of government contracts.

## STANDING TO SUE[21]

Even assuming that the Bank is an "agency" subject to the judicial review pro-

---

**20.** Federal Reserve Banks have been held to be instrumentalities of the United States and as such exempt from certain state and local taxes. *See, e.g., Federal Reserve Bank v. Metrocentre Improvement Dist. # 1,* 657 F.2d 183 (8th Cir. 1981); *Federal Reserve Bank v. Commissioner of Corps. & Taxation,* 520 F.2d 221 (1st Cir. 1975); *Federal Reserve Bank v. Delta County Register of Deeds,* 288 Mich. 120, 284 N.W. 667 (1939). Federal Reserve Banks have been held to be part of "United States" and the "Federal Government" for purposes of the Service Contract Act, 41 U.S.C. §§ 351 to 358. *Brink's, Inc. v. Board of Governors of the Federal Reserve System,* 466 F.Supp. 116 (D.D.C.1979). However, in *Lewis v. United States,* 680 F.2d 1239 (9th Cir.1982), the Ninth Circuit, in an opinion by Judge Poole, held that Federal "Reserve Banks are not federal instrumentalities

for purposes of the [Federal Tort Claims Act, 28 U.S.C. §§ 1346 & 2671 to 2680], but are independent, privately owned and locally controlled corporations." At 1241.

**21.** It has been suggested that in certain instances it might be wise to refrain from deciding a difficult standing issue when the merits of the case are easily resolvable. *Chinese American Civic Council v. Attorney General,* 566 F.2d 321, 325 (D.C.Cir.1977) (MacKinnon, J.) ("Prudential considerations also restrain us from deciding the difficult and unquestionably far-reaching standing question when the merits of the case readily provide a fair, clear resolution of the appeal."); *id.* at 331 (Kaufman, J., concurring specially) ("I am in agreement with Judge MacKinnon that "[p]rudential considerations" . . . should restrain us in this case from

visions of the APA, the Bank and Provident contend that Lee lacks standing to seek review of the Bank's actions under 5 U.S.C. § 702.

A well-established line of authority indicates that an unsuccessful bidder on a government contract may have standing to challenge the agency's actions in connection with the award of the contract if such unsuccessful bidder can make a prima facie showing alleging an arbitrary or capricious abuse of discretion or otherwise illegal action by the government agency involved. In *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), the plaintiff was the second-lowest bidder for a contract with the Federal Aviation Administration (FAA) for instrument landing systems to be installed at airports. Plaintiff claimed that the bid of the lowest bidder, which was accepted by the FAA, was nonresponsive to the invitation for bids in two material respects and that the FAA's award of the contract to that lowest bidder violated the statutory provisions and regulations controlling government contracts. The applicable regulations provided, *inter alia:* " '*To be considered for award, a bid must comply in all material respects with the invitation for bids . . . .*' " *Id.* at 861 (emphasis by Judge Tamm). Those regulations further provided: " '*Any bid which fails to conform to the essential requirements of the invitation for bids . . . shall be rejected as non-responsive.*' " *Id.* (emphasis by Judge Tamm). Plaintiff asserted that the FAA's action in granting the contract to an allegedly nonresponsive bidder was arbitrary, capricious and a violation of applicable law and thus could be set aside under 5 U.S.C. § 706.[22]

In *Scanwell,* Judge Tamm extensively reviewed the law of standing and held (424 F.2d at 869):

It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties. It is also incontestible that that discretion may not be abused. Surely there are criteria to be taken into consideration other than price; contracting officers may properly evaluate those criteria and base their final decisions upon the result of their analysis. They may not base decisions on arbitrary or capricious abuses of discretion, however, and *our holding here is that one who makes a prima facie showing alleging such action on the part of an agency or contracting officer has standing to sue under section 10 of the Administrative Procedure Act* [5 U.S.C. § 702].

(Emphasis added.) Judge Tamm also made it plain (at 864) that the court was construing very broadly the law of standing under the APA and adopting a "private attorney general" theory of standing.

Thus the essential thrust of appellant's claim on the merits is to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit

deciding the question of standing . . . unless we need to do so."). The within case may similarly be a case where the standing issues are more difficult than the merit issues, thereby arguably making it more prudent to resolve the easier merit issues than to decide the more difficult standing issues. However, as Judge Oakes has suggested, such an approach may be improper. "The court below assumed standing *arguendo* and proceeded to consider the merits, a practice that must be disapproved. It is axiomatic that a court should not entertain the merits of an action if the plaintiff cannot show some cognizable injury." *Santos v. District Council of New York City & Vicinity of United Bhd. of*

*Carpenters & Joiners,* 547 F.2d 197, 199 (2d Cir.1977). Accordingly, herein, the issue of Lee's standing will be decided first. It is to be noted that in this case Lee's inability to demonstrate standing is underpinned by the same factors which call for dismissal of its Amended Complaint for failure to state a cause of action on the merits.

**22.** 5 U.S.C. § 706(2)(A) provides in pertinent part: "The reviewing court shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

itself is brought in the public interest by one acting essentially as a "private attorney general."

Again (at 866–67), Judge Tamm stated: Regardless of the merits of plaintiff's case, it should be granted the right, if possible, to make a prima facie showing that the government's agents did in fact ignore the Congressional guidelines in the manner in which they handled the granting of the contracts. If there is arbitrary or capricious action of the part of any contracting official, who is going to complain about it, if not the party denied a contract as a result of the alleged illegal activity? It seems to us that it will be a very healthy check on governmental action to allow such suits, at least until or unless this country adopts the *ombudsman* system used so successfully as a watchdog of government activity elsewhere.

Following *Scanwell,* other courts, including the Fourth Circuit, have held that disappointed bidders on government contracts have standing. *See, e.g., William F. Wilke, Inc. v. Department of the Army,* 485 F.2d 180 (4th Cir.1973); *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *Keco Industries, Inc. v. United States,* 428 F.2d 1233 (Ct.Cl.1970); *Lombard Corp. v. Resor,* 321 F.Supp. 687 (D.D.C.1970).

In *Merriam,* the plaintiff (Merriam) was one of the unsuccessful bidders on a solicitation for bids to furnish leasehold office space to the General Services Administration (GSA) and sought to set aside the award to the successful bidder (Gateway) and to enjoin the execution of the lease. Merriam contended that the award of the lease was illegal under applicable law and that Gateway's bid was nonresponsive to the solicitation for bids. Relying on *Scanwell* and its progeny, Judge Gibbons held that Merriam had standing to challenge the award of the lease.

In so holding, Judge Gibbons expressly rejected the Government's contention that *Scanwell* and its progeny were inconsistent with the Supreme Court's decisions in *Association of Data Processing Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), which established a two-prong test of standing for purposes of judicial review of agency action under the APA: (1) the plaintiff must "allege[ ] that the challenged action has caused him injury in fact, economic or otherwise" and (2) the plaintiff must demonstrate that "the interest sought to be protected by [him] is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing,* 397 U.S. at 152–53, 90 S.Ct. at 829–30.[23]

**23.** Supreme Court decisions since *Data Processing* have resulted in some confusion regarding the status of the so-called "zone" test of standing. *See generally* Davis (2d ed.) § 22.02–11, at 347–52 (1982 Supp.) (Davis queries: "Is the 'zone' test the law?") "A survey of the law reveals … more variety than uniformity among the approaches to the zone test. Some courts, reacting strongly to the Supreme Court's vague formulation of the test, have expressed disagreement with the standard, clearly misapplied it, or virtually ignored it." *Control Data Corp. v. Baldridge,* 655 F.2d 283, 293 & nn. 16–18 (D.C.Cir.1981) (Tamm, J.) (footnotes omitted) (citing cases). *See William F. Wilke, Inc. v. Department of the Army,* 485 F.2d 180 (4th Cir.1973), discussed *infra,* in which the Fourth Circuit, relying on *Scanwell* and *Merriam,* granted standing to a disappointed bidder without specifically referring to the zone test. The District of Columbia Circuit and the Seventh Circuit, however, have recently

indicated that the zone test is a prudential limitation on standing which must be applied in actions seeking judicial review under the APA. *People's Gas, Light & Coke Co. v. United States Postal Service,* 658 F.2d 1182 (7th Cir.1981); *Control Data Corp., supra.* It would seem, moreover, that a "zone" analysis is implicit in the requirement of *Scanwell*—a pre-*Data Processing* case—that the plaintiff must make a prima facie showing of arbitrary, capricious or otherwise illegal action. "[I]t appears to this Court that the *Scanwell* court came close to articulating such 'a test' and that the decision in that case is not inconsistent with later decisions applying the zone of interests test." *Honeywell Informations Systems, Inc. v. Hodges,* 85 F.R.D. 339, 343 (D.D.C.1980), *aff'd sub nom. Control Data Corp. v. Baldridge,* 655 F.2d 283 (D.C.Cir.1981). In *Ballerina Pen Co. v. Kunzig,* 433 F.2d 1204 (D.C.Cir.1970), a post-*Data Processing* case, Judge Tamm wrote: "The plaintiff must further allege that the agen-

The Government contended that the statutes and regulations applicable to government procurement were intended solely for the benefit of the Government and thus that no nongovernmental entity fell within the zone of interest protected by those statutes and regulations. In rejecting that contention, Judge Gibbons wrote (476 F.2d at 1242):

It is noteworthy that 41 U.S.C. § 253(b) [24] permits the rejection of all bids in the public interest, and permits the acceptance of any bid conforming to the invitation to bids found to be the most advantageous to the Government, *but does not permit the acceptance of a bid not conforming to the invitation to bids.* . . . Patently the statute protects not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it. Merriam, as a bidder, is within the zone of interest protected by the applicable procurement statute.

(Emphasis by Judge Gibbons.) (Footnotes and citations omitted.) Moreover, in a footnote to the passage quoted above, Judge Gibbons suggested that a disappointed bidder might also satisfy the zone test on the basis of the Government's nonstatutory "obligation of fair dealing" in connection with the solicitation and consideration of bids (*id.* at 1242 n. 7):

Even assuming that Merriam did not fall within a zone of interest protected by 41 U.S.C. § 253, we would be inclined to

hold that his standing as a litigant should nonetheless be recognized. In a Hohfeldian sense a legal right can have its origin elsewhere than in a statute. When the Government solicits proposals to which bidders in good faith take the trouble to respond, the actual relationship between the solicitor and the bidder is not the same as before. The bidder has placed in the hands of the representatives of the Government the power to bind him to a contract. It is not too much to find a correlative obligation of fair dealing within the terms of the solicitation; an obligation sufficient to confer standing to enforce that obligation.

Judge Gibbons also seemingly suggested a willingness on the part of the Court to confer standing upon Merriam solely on the basis of a showing of injury in fact (*id.* at 1241):

Assuming for the moment, as the Government contends, that both the Independent Offices Appropriations Act and the Public Buildings Amendments of 1972 were designed to protect no zone of interest within which he falls, Merriam may nevertheless assert the public interest provided he has suffered injury in fact. In addition to the destruction of a present and a future potentially profitable relationship with the Government, an injury which the district court acknowledged, Merriam also suffered loss of the costs incurred in preparing and submitting his proposal. Such an injury has been recognized as compensable by the Court of

cy has acted arbitrarily, capriciously, or in excess of its statutory authority, so as to injure an interest that 'is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 1207 (quoting *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 830). *See also Constructores Civiles v. Hannah,* 459 F.2d 1183, 1186 (D.C.Cir.1972). In *Ballerina Pen* the court carefully reviewed the plaintiff's allegations to determine whether or not plaintiff had made a prima facie showing of illegality. If this Court were to apply the zone test in the within case, it would conclude that Lee had failed to satisfy it for the same reasons that this Court concludes that Lee has failed to make a prima facie showing of arbitrary, capricious or illegal activity on the part of the Bank. Lee

seemingly has pointed to no applicable statute or regulation which the Bank allegedly violated. Thus, Lee's interests do not fall within the zone of interests protected by any statute.

24. That statute provides:

All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: *Provided,* That all bids may be rejected when the agency head determines that it is in the public interest so to do.

Claims when an unsuccessful bidder seeks judicial review of an allegedly illegal award in that court. *Keco Industries, Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970).

In *Wilke,* the Fourth Circuit, in an opinion by then Chief Judge Haynsworth, relied on *Scanwell* and *Merriam* in holding that an unsuccessful bidder had standing. The plaintiff (Wilke), the second lowest bidder on a contract for barracks rehabilitation at Fort Meade, claimed that the Army had wrongfully considered the untimely bid of the bidder whose bid turned out to be lowest. The advertisement for bids specified that bids would be received until a specified time on a specified date and then would be publicly opened at that time. Although the lowest bidder's bid was submitted four minutes late, it was accepted for consideration by the Army. In holding that Wilke had standing to sue, Judge Haynsworth wrote (485 F.2d at 183):

> While those seeking Government contracts have no right to the award of a contract, they do have a right to reasonable treatment of their bids. [Citations omitted.] This right derives from the combination of the statutory scheme regulating military procurement [citation omitted] and the review provision of the Administrative Procedure Act, 5 U.S.C. § 702.

> Because of the Army's acceptance of a tardy bid, Wilke lost any chance to be awarded the Fort Meade contract. Wilke thus suffered a financial loss as a result of the Army's failure to follow its own regulations and bid specifications. Similarly the public was wronged by the Army's disregard of express legislation. The general public, however, has no legal recourse. Only a party suffering injury in fact has standing to protect this interest. [Citation omitted.] It is because of its injury that "[p]laintiff, and others like it, have a litigable interest in attempting to protect the public interest in the integrity of the competitive bidding process * * *." *Lombard Corp. v. Resor,* 321 F.Supp. 687, 692 (D.D.C.1970).

Lee, its Amended Complaint, has alleged injury—*i.e.,* the loss of the opportunity to purchase and develop what Lee considered to be a valuable property. But such an allegation of injury, by itself, is not sufficient to confer standing on Lee in the absence of any colorable allegations of arbitrary, capricious or otherwise illegal action by the Bank. To have standing even under certain of the approaches of *Scanwell,* an unsuccessful bidder must at the very least make a prima facie showing of such type of action by the government agency. The allegations of Lee's Amended Complaint, even accepted as true and construed in the light most favorable to Lee, do not make such a showing. Rather, Lee complains only in the most conclusory way of the "illegality" of the Bank's actions in connection with the invitation and consideration of the bids at issue herein. However, Lee's own factual allegations do not support even an inference of illegality.

The question arises as to whether or not the provision of the Federal Property and Administrative Services Act (FPASA) applicable to the disposal of surplus real property, 40 U.S.C. § 484, and the pertinent regulations under FPASA, govern the bidding procedures employed by the Bank. Subsection (e) of that statute states in pertinent part:

> (e)(1) All disposals or contracts for disposal of surplus real property (other than by abandonment, destruction, donation, or through contract brokers) made or authorized by the Administrator [of GSA] shall be made after publicly advertising for bids, under regulations prescribed by the Administrator . . . .

> (2) Whenever public advertising for bids is required under paragraph (1) of this subsection—

> (A) the advertisement for bids shall be made at such time previous to the disposal or contract, through such methods, and on such terms and conditions as shall permit that full and free competition which is consistent with the value and nature of the property involved;

(B) all bids shall be publicly disclosed at the time and place stated in the advertisement;

(C) award shall be made with reasonable promptness by notice to the responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: *Provided,* That all bids may be rejected when it is in the public interest to do so.

The applicable regulations are to the same effect. *See* 41 C.F.R. § 101–47.304–7(a) (1981).

FPASA defines "surplus property" as follows: "The term 'surplus property' means any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator." 40 U.S.C. § 472(g). "Excess property" is defined as "property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." *Id.* § 472(e). "Federal agency" in turn is defined as "any executive agency or any establishment in the legislative or judicial branch of the Government (except the Senate, the House of Representatives, and the Architect of the Capitol and any activities under his direction)." *Id.* § 472(b). Finally, "[t]he term 'executive agency' means any executive department or independent establishment in the executive branch of the Government, including any wholly owned Government corporation." *Id.* § 472(a).

The Board of Governors of the Federal Reserve System (Board) is an independent regulatory agency outside of the control of the executive branch of the Federal Government. *See, e.g.,* 12 U.S.C. § 250; S.Rep. No. 902, 93 Cong., 2d Sess. (1974),

*reprinted in* 1974 U.S.Code Cong. & Ad. News 6119, 6128–29; 4 *Banking Law* § 77.-03[2], at 77–9. Accordingly, the Board would not seem to be an "executive agency" for purposes of FPASA. Further, the Board would seemingly not fall within the definition of "Federal agency" for purposes of FPASA. It would also not seem that the Board should be considered to be an "establishment in the legislative . . . branch of the Government." Although it seems plain that the Congress has delegated legislative power to the Board, it does not necessarily follow that the Board is an establishment *in* the legislative branch.

The fact that the Board apparently possesses exclusive control over property owned both by the Board and by the Federal Reserve Banks strengthens the conclusion that the Board is not a "Federal agency" for purposes of FPASA. The legislative purpose of FPASA was to bring federal property management under the control of the newly-established General Services Administration (GSA). *See* H.R.Rep. No. 670, 81st Cong., 1st Sess. (1949), *reprinted in* 1949 U.S.Code Cong. & Ad.News 1475. The Board itself, however, has been given exclusive control over the construction, equipping, furnishing and operation of its principal office building in Washington, D.C.[25] In addition, the Board has substantial independence with regard to and substantial control over the expenditure of funds for the construction of Federal Reserve Bank branch buildings. Construction of such branch-bank buildings by a Federal Reserve Bank requires the approval of the Board.[26] Further, the Board has exclusive control over the expenditure of funds for such buildings, provided the aggregate of the costs of such buildings after July 30, 1947, does not exceed $140 million.[27] The Board

25. 12 U.S.C. § 243.

26. 12 U.S.C. § 521.

27. 12 U.S.C. § 522. "Appropriated funds are not used in constructing Federal Reserve buildings; the cost of construction is amortized out of the earnings of the Federal Reserve banks over a period of years." S.Rep. No. 902, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.

Code Cong. & Ad.News 6119, 6126. It has been argued that giving the Board independent control over the expenditure of funds for the construction of branch-bank buildings is an abdication of congressional oversight responsibility. *See* H.R.Rep. No. 2061, 87th Cong., 2d Sess. (1962), *reprinted in* 1962 U.S.Code Cong. & Ad.News 2242, 2244 (dissenting views of

also seemingly exercises substantial supervisory control over Federal Reserve Bank procurement and building renovation and construction. The Division of Federal Reserve Bank Operations, which "advises and assists the Board with respect to matters concerning the planning and programs for operation of the Federal Reserve Banks," is responsible, *inter alia,* for providing to the Board "an appraisal of Reserve Bank building programs, and recommendation on building program matters." Rules of Organization of Federal Reserve System, 26 Fed.Reg. 12638, as revised effective Nov. 2, 1976; 12 U.S.C. § 222 note App. The Board has delegated to the Staff Director for Federal Reserve Bank Activities or his designee supervisory authority over, *inter alia,* Federal Reserve Bank procurement, remodeling or renovation of Federal Reserve Bank or Branch buildings, and agreements with architects and consultants and individual construction change orders in connection with new construction or renovation projects undertaken by Federal Reserve Banks. 12 C.F.R. § 265.2(d) (1981). Apparently, therefore, neither the Board itself nor any Federal Reserve Bank is governed by FPASA or under the jurisdiction of GSA. In fact, a Senate Report states: "At present, Federal Reserve construction procedures may at best be described as highly informal. Competitive bidding is not required. The other safeguards which the General Services Administration imposes on most federal construction are not applicable

to the Fed." S.Rep. No. 902, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6119, 6135 (additional views of Senators Proxmire and Williams).[28]

It therefore seems plain that no congressional enactment governs the manner in which a Federal Reserve Bank may dispose of surplus real property. Rather, Congress has left the supervision of such disposal to the discretion of the Board.[29] In that connection, it is to be noted that none of counsel for Lee, the Bank or Provident have identified—and this Court does not know of—any regulation promulgated by the Board itself which the Bank even allegedly violated in connection with the bidding actions under challenge in this case.

Even if FPASA governed, however, the Bank would not seem to have violated any material provision thereof to the detriment of Lee. It is true that 40 U.S.C. § 484(e)(2)(B) provides for public opening of bids, while paragraph 4.1 of the bid instructions applicable herein provided that bids would be privately opened by the Bank. However, Lee alleges no injury as a result of such private opening. Lee does allege injury because its nonconforming bid was not accepted. However, FPASA, 40 U.S.C. § 484(e)(2)(C), if it is applicable, does not authorize the acceptance of any nonconforming bid. Hence, if FPASA was applicable, the Bank would, in any case, have been prohibited by law from accepting Lee's nonconforming bid.

Congressmen Patman and Gonzalez). However, in 1974, the Senate Committee on Banking, Housing and Urban Affairs rejected a proposal to subject the operations of the Board to audit by the General Accounting Office. S.Rep. No. 902, *supra,* 1974 U.S.Code Cong. & Ad.News at 6134.

**28.** The relevant Conference Report stated:

The conferees expect, however, that the Federal Reserve will conform to the requirements imposed upon Federal agencies by the President to undertake . . . construction in a manner which is consistent with efforts to reduce inflationary pressures. The conferees unanimously recommended that the Federal Reserve avail itself of the safeguards imposed by the General Services Administration on most Federal building construction and the advantages of requiring competitive

bidding be fully considered at such time as a decision is reached to proceed.
Conf.Rep. No. 1429, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6148, 6150. That statement, however, in no way undercuts the conclusion that property management and disposal within the Federal Reserve System are under the exclusive control of the Board.

**29.** That conclusion raises the possibility that this Court's review under the APA of the Bank's actions is precluded by the terms of the judicial review provisions of the APA itself, which provides: "This chapter applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). *See also* note 34 *infra.*

Lee's position is thus much like that of the plaintiff in *PRI Pipe Supports v. Tennessee Valley Authority*, 494 F.Supp. 974 (N.D.Miss.1980). In that case the court held that a nonresponsive bidder had no standing to challenge the acceptance of another's bid (*id.* at 977):

> Admittedly, one of the stated policies of [certain federal regulations dealing with surplus labor areas] is to give priority to contractors performing in certain areas. The undisputed facts show that PRI's bid was unresponsive in this regard. It is not an injury resulting from a violation of this policy about which PRI is complaining; rather it is an injury resulting from the fact that its bid was not selected. *This injury alone is insufficient to confer standing.*

(Emphasis added.)

Lee further attempts to argue that 12 U.S.C. § 341, Seventh,[30] imposes a duty upon the Bank to conduct its affairs in a prudent and responsible manner and that the Bank breached that duty. The language of that statutory provision, however, is enabling or empowering legislation which does not impose any affirmative restrictions or prohibitions upon the Bank, and which hardly appears to impose any such restrictions or prohibitions upon the Bank for benefit of persons such as Lee.[31]

It is true that Chief Judge Caffrey in *Armano v. Federal Reserve Bank*, 468 F.Supp. 674, 675–76 (D.Mass.1979), wrote:

> Federal reserve banks derive their existence and corporate power from the Federal Reserve Act under which they are organized. They have no greater powers than those expressly granted by this Act and those incidental powers "necessary to meet all the legitimate demands of the authorized business and to conduct its affairs within the general scope of its character [sic], safely and prudently." *Federal Reserve Bank of Richmond v. Duffy*, 210 N.C. 598, 188 S.E. 82, 84 (1936).

But even if the Bank had a *duty* to conduct its business in a "responsible and prudent manner" and even if such a duty is privately enforceable, the allegations of Lee's Amended Complaint do not raise even the slightest inference that the Bank acted in any irresponsible or imprudent manner in connection with the bidding process.

On the basis of *Merriam*, Lee might assert, apart from any statutory provision, that there is an independently enforceable "obligation of fair dealing," *Merriam, supra*, 476 F.2d at 1242 n. 7, on the part of the Bank or, on the basis of *Wilke*, that it (Lee) has an independently enforceable "right to reasonable treatment of [its] bid," *Wilke, supra*, 485 F.2d at 183. Even assuming *arguendo* only that such rights and/or obligations exist, *per se*, Lee has established herein no standing to assert or enforce such rights or obligations. Apart from Lee's conclusory allegations of unreasonableness, Lee's Amended Complaint, far from making a prima facie showing, does not support even the slightest possibility that the Bank dealt with Lee unfairly or that the Bank treated Lee's bid unreasonably. In fact, quite to the contrary, Lee's Amended Complaint demonstrates that the Bank dealt with Lee fairly and in good faith and that Lee's bid received reasonable consideration. Nevertheless, Lee tries to somehow turn the Bank's fair, reasonable actions with regard

---

**30.** That statute provides in pertinent part:

[A] Federal reserve bank ... shall have power ... [t]o exercise by its boards of directors, or duly authorized officers or agents, all powers specifically granted by the provisions of this chapter and such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter.

**31.** Under applicable principles of law a private cause of action cannot be implied under 12 U.S.C. § 341. *See, e.g., Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 99 S.Ct. 1946, 60 L.Ed.2d 560, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677 (1979); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Supervision of the activities of the Federal Reserve Banks seemingly has been entrusted to the Board.

to Lee's bid against the Bank by asserting that the Bank should have afforded the same opportunities to others that it afforded to Lee. However, fairly read, Lee's Amended Complaint does not allege that the Bank did not give Lee any opportunity that the Bank should have given Lee.

Judge Gibbons has suggested in *Merriam* that the loss of a "potentially profitable relationship with the Government" might constitute sufficient injury in fact to confer standing upon a plaintiff to "assert the public interest." *Merriam, supra,* 476 F.2d at 1241. Even assuming that an allegation of such injury is sufficient by itself to confer standing, any loss suffered by Lee was, by Lee's own admission, due solely to Lee's inability to conform its bid to the terms and conditions lawfully[32] imposed by the Bank and was not due to any arbitrary, capricious or otherwise illegal action on the part of the Bank.

*Merriam* also suggests that the loss of bid preparation costs might be a sufficient injury to confer standing upon an unsuccessful bidder. *Merriam, supra,* 476 F.2d at 1241. Several courts have recognized that in certain circumstances an unsuccessful bidder alleging illegality in the award of the contract may recover bid preparation costs in the Court of Claims.[33] In the instant case, however, paragraph 11.2 of the bid instructions provided: "The Bank shall not be liable for any costs or expenses incurred by bidders in the preparation and/or submission of bids." In the light of that provision, Lee cannot now reasonably claim to have been injured by the loss of bid preparation costs since Lee was on notice before the submission of its bid that it would have to bear such costs regardless of whether or not the Bank accepted its bid.

Lee also seemingly contends that it has standing to assert the rights of other bidders who were injured by the bidding procedures employed by the Bank. Assuming *arguendo* only that Lee has standing to assert the rights of third persons (which, in the absence of injury to itself, it seemingly does not have), Lee's contention that the Bank somehow inhibited the bidding process by not notifying prospective bidders that it would entertain nonconforming bids (*e.g.,* like Lee's bid, subject to financing contingencies and/or unaccompanied by the required certified check) lacks merit. In fact, the bid instructions fairly apprised prospective bidders that the Bank might entertain such bids. Paragraph 4.2 provided that the Bank had the right "to negotiate with any bidder about the terms of his bid, or to take any other action with respect to any bid which it in its sole discretion may deem proper under the circumstances." Paragraph 4.3 provided that the Bank reserved "the right to waive any formality or irregularity in any bid received."

---

**32.** Lee makes no allegation in the Amended Complaint that any of the terms and conditions set forth in the bid instructions were unlawful.

**33.** *See, e.g., Cincinnati Elecs. Corp. v. Kleppe,* 509 F.2d 1080, 1089 (6th Cir.1975); *Excavation Constr., Inc. v. United States,* 494 F.2d 1289, 1290 (Ct.Cl.1974); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302 (D.C.Cir.1971); *Keco Indus., Inc. v. United States,* 428 F.2d 1233, 1240 (Ct.Cl.1970); *Lametti & Sons, Inc. v. City of Davenport,* 432 F.Supp. 713, 715 (S.D. Iowa 1975); *Heyer Prods. Co. v. United States,* 140 F.Supp. 409, 412 (Ct.Cl.1956). Lost profits are not recoverable. *Keco Indus., Inc. v. United States, supra,* 428 F.2d at 1240; *Heyer Prods. Co. v. United States, supra,* 140 F.Supp. at 412. Even the recovery of bid preparation costs is dependent upon a showing that the government agency's award of the contract to another was without rational basis. *Excavation Constr., Inc. v. United States, supra,* 494 F.2d at 1290; *cf. M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1306 ("court must refrain from judicial intervention into the procurement process unless the actions of the executive officials are without rational basis"). Because of the availability of an adequate legal remedy, *i.e.,* an action to recover bid preparation costs in the Court of Claims, courts have denied injunctive relief. *Cincinnati Elecs. Corp. v. Kleppe, supra,* 509 F.2d at 1089; *cf. William F. Wilke, Inc. v. Department of the Army,* 485 F.2d 180, 182 (4th Cir.1973) (Fourth Circuit affirmed district court's denial of injunctive relief and noted that plaintiff "may still seek recovery of bid preparation costs in the Court of Claims"); *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1302 (availability of action in the Court of Claims for recovery of bid preparation costs is factor to be taken into account by court in exercising discretion as to whether to entertain suit for injunctive relief).

In sum, Lee has failed to make a prima facie showing of arbitrary, capricious or illegal action by the Bank. In all of the cases relied upon by Lee with regard to standing, the plaintiff had made at least a facial showing that the agency's actions were arbitrary, capricious or unlawful. Lee has not made such a facial showing. Accordingly, for the reasons stated above, this Court concludes that Lee lacks standing to seek review under 5 U.S.C. § 702.

The requirement that for purposes of demonstrating standing a plaintiff must make a prima facie showing of an arbitrary or capricious abuse of discretion or of otherwise illegal action is a sound one. Such a requirement will control the grant of standing "in order that completely frivolous lawsuits will be averted." *Scanwell, supra,* 424 F.2d at 872. *See also Ballerina Pen Co. v. Kunzig,* 433 F.2d 1204, 1209 & n. 10 (D.C. Cir.1970).

## MERITS

Even assuming *arguendo*, however, that Lee's economic injury, which was due solely to its own failure to conform its bid to the terms and condition of the bid instructions, is by itself sufficient to confer standing upon Lee, Lee's Amended Complaint must nevertheless be dismissed for failure to state a claim upon which relief can be granted. As the discussion *supra* demonstrates, Lee has pointed to no applicable provision of law which the Bank has allegedly violated and this Court knows of no such provision. Further, the allegations of Lee's Amended Complaint belie any contention that the Bank's actions in connection with its consideration and ultimate rejection of Lee's nonconforming bid was arbitrary or capricious. In fact, in ultimately rejecting Lee's bid because it was subject to a financing contingency, the Bank would seem to have acted most reasonably. A bid subject to such a contingency is not a firm offer. The Bank gave Lee a reasonable period of time (one month) within which to secure a firm commitment for financing. It was not, by any stretch of the imagination, arbitrary or capricious for the Bank to decide that it did not want to allow Lee more than one month to secure such a commitment, particularly in the light of the fact that the Bank had reserved to itself total discretion to reject any and all bids. The Bank was under no obligation to negotiate with Lee at all or to give Lee any extension of time within which to cure the nonconformity in its bid. The Bank would have been perfectly justified in rejecting Lee's nonconforming bid outright. Lee is in no better position to complain simply because the Bank gave Lee a reasonable length of time in which to cure the nonconformity in its bid.[34]

## CONCLUSION

For the reasons stated in this opinion, both the Bank's and Provident's motions to dismiss the Amended Complaint for failure to state a cause of action will be granted. An appropriate Order of even date herewith will be entered.

---

34. In general, a solicitation of bids is only an invitation for offers and all bids may be rejected. *Restatement (Second) of Contracts* § 28 comment c (1982). *See Ferry v. Udall,* 336 F.2d 706, 710 (9th Cir.1964), *cert. denied,* 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965). For this reason, the Bank's actions may well be ones "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2) (discussed in *Ferry, supra,* 336 F.2d at 711). *See also* note 29 *supra.*